[Civ. No. 18511. First Dist., Div. One. Jan. 25, 1960.]

NESBITT FRUIT PRODUCTS, INC. (a Corporation), et al., Respondents, v. DEL MONTE BEVERAGE COMPANY (a Corporation) et al., Appellants.

354

Francis Heisler, Charles A. Stewart and Patricia Lane for Appellants.

Wyckoff, Parker, Boyle & Pope for Respondents.

BRAY, P. J.—Defendants appeal from a judgment restraining them from using bottles, labels, etc., bearing the trademarks ''Nesbitt's of California'' or ''Nesbitt'' or ''Sprig,'' and from bottling, selling or distributing beverages manufactured under authority from plaintiffs.

### QUESTIONS PRESENTED
1. The validity and effect of an agreement of compromise.
2. Sufficiency of findings.
3. Admission of business records.

### RECORD
Upon the theory that franchises granted defendants by plaintiffs had terminated, plaintiffs, manufacturers of bottling concentrates, brought this action to permanently enjoin defendants from using bottle containers, labels and crowns bearing plaintiffs' trademarks, and from selling or distributing beverages as licensee or purported licensee under plaintiffs' trade names. Defendant Del Monte Beverage Company, a corporation, filed a cross-complaint against plaintiffs and a new party, Coca-Cola Bottling Company, for an injunction restraining plaintiffs from entering licensing agreements with parties other than Del Monte or in the alternative for con-

spiracy and breach of contract. The court denied Del Monte relief on its cross-complaint, and granted plaintiffs the injunction above mentioned.

## EVIDENCE

Plaintiffs own and manufacture beverage bases used in the production of soft drinks bearing the trademarks ''Nesbitt's'' and ''Sprig.'' December 4, 1956, Nesbitt, in writing, granted to defendant ''Nesbitt's Bottling Company, a partnership'' purportedly comprised of defendants Melicia and Deasey (the agreement was signed by Melicia and Deasey), the exclusive right to bottle and sell its products in a certain area. About the same time Sprig orally agreed with defendant Nesbitt's Bottling Company to enter into a similar franchise agreement. Although no written agreement was ever executed, the parties conducted themselves as if such an agreement had been executed.

Paragraph 9 of the written contract provided that the contract ''automatically terminates in case said holder is a partnership and said partnership is for any reason whatsoever dissolved.'' Other provisions provided for termination by the licensor for specified causes upon 30 days written notice. While there is some conflict between the testimony of Elliott, plaintiffs' district manager, and that of Melicia, the court apparently believed Elliott's version, which was to the effect that Melicia and Deasey informed him before the contract was entered into that they were purchasing the business of the prior franchise holder; that they intended to operate the franchise as a partnership comprised of themselves and Melicia's mother. Deasey was to be the manager and Melicia was to operate the bottling plant. Plaintiffs were more interested in Deasey than in Melicia because the former had beverage experience. February 19, 1957, Melicia told Elliott that Deasey had not had much time to devote to the business because he was winding up other business activities, but that Deasey would be coming in as active manager. On one or more occasions defendants' checks to plaintiffs in payment of merchandise were dishonored. In June, Elliott learned for the first time that Nesbitt Bottling Company was not a partnership but was Del Monte Beverage Company, a corporation, operating under that name. Melicia told him that Deasey had not been connected with the enterprise as he had not put in his share of the capital and that he was not associated with the organiza-

tion. Because Melicia was short of capital, some of the equipment, labor and finances which Elliott had stated in the beginning was necessary to hold the franchise, was not available. Melicia could buy bottles and sugar for cash only and nothing had been done to improve the plant or trucks as required by Elliott. June 5, Elliott talked to cross-defendant Coca-Cola to ascertain if it would be interested in obtaining the franchise at a later date. A June 4 order on plaintiff Nesbitt by Melicia for a two weeks' supply of concentrate was filled, but one ordered June 14 was not filled, because plaintiffs believed that the contracts were automatically terminated by the discovery that Nesbitt's Bottling Company was not a partnership and by the fact that on June 17 and 18, plaintiff Nesbitt and plaintiff Sprig respectively had sent registered letters to Nesbitt's Bottling Company stating that since the latter was not operating as a partnership, the franchise was automatically cancelled under paragraph 9 of the agreement.

Defendants' attorney wrote plaintiffs threatening an injunction suit if the franchise were not reinstated. A meeting was had between Elliott, defendants' attorney, Melicia and others friendly to him. The parties were hostile to one another. Melicia was still threatening to sue plaintiffs. After considerable discussion, Elliott suggested that in compromise the franchises which he claimed had terminated be extended for 30 days. Melicia refused to agree to that but finally proposed an extension to October 15. Elliott agreed to consult his principal, who agreed to give Melicia the four months' period to sell the plant or make other arrangements for his bottling.

June 27 an agreement was executed (drawn by defendants' attorney) in which it was stated that Del Monte Beverage Company, a corporation doing business under the name of Nesbitt Bottling Company, "is the owner and holder of a Sprig Bottler's Contract and a Nesbitt's Bottling Contract as Licensee"; that a dispute had arisen between Del Monte, Sprig and Nesbitt "and for the purpose of fully settling and compromising the difference between the parties it is hereby agreed that Del Monte may continue to operate as Licensee under its Sprig Bottler's Contract and its Nesbitt Bottling Contract under the terms and conditions provided in said contracts to and including the fifteenth (15th) day of October 1957, on which date all rights under said bottling contracts shall terminate." Another provision stated: "It is the purpose

of this Agreement to settle all disputes between the parties now existing concerning any rights or claims connected with or arising out of any bottling contract franchises or distribution rights, and this Agreement is in full satisfaction of all claims and demands of the parties, each against the other, except as specifically agreed upon by this Agreement, and

"Provided further that all the terms and conditions of the Sprig Bottler's Contract and the Nesbitt Bottler's Contract shall be complied with between the parties after the date of this Agreement and up to and including October fifteenth (15th) 1957." Plaintiffs later extended the termination date to March 1, 1958. Between June and December, 1957, a series of checks from defendants to plaintiffs were dishonored. December 18 and 27, letters were sent defendants stating that the franchises would expire March 1, 1958. Additional notices to the same effect were sent defendants in February, 1958.

1. Agreement Valid.

Defendants first contend that the agreement was entered into under duress and hence invalid. (See *Young* v. *Hoagland* (1931), 212 Cal. 426 [208 P. 996, 75 A.L.R. 654].) They say that plaintiffs were national manufacturers who were in a position to relicense the area while defendants stood to lose their entire investment of approximately $20,000. Further, they contend that plaintiffs knew when the licensing agreements were entered into that defendants were a corporation. While there is some conflict in the evidence on this latter point, there is ample evidence to support the court's finding that plaintiffs at that time and until June, 1957, believed defendants to be a partnership. There is no evidence of duress. Defendants were not properly performing under the contract. They had not provided the additional truck and other matters which it had been agreed they would provide. Their checks had bounced, their credit was impaired; also they brought themselves within the provision to the effect that in case the holder of the franchise was a partnership which had been dissolved the agreement "automatically" terminated.

As bearing upon the question of duress, defendants contend that the contract was one of indefinite duration rather than one terminable on notice. Paragraph 2 provided: ". . . so long as said Licensee shall comply with the terms of this contract the rights and privileges herein assigned to said Licensee shall remain in full force and effect." Para-

graph 5 provided that ''The term of this agreement and license shall be for the period of one year from the date hereof, *and unless canceled shall continue from year to year, except that either party hereto may cancel this agreement by giving the other written notice of such cancellation and termination thirty days prior to the expiration of any year.*'' (Emphasis added.) Other provisions provided for termination by the licensor for specified causes upon 30 days' written notice. It is clear that under paragraph 5 the contract is to run from year to year and that as provided in paragraph 2 during such term the license granted is in effect so long as the licensee complies with the terms of the contract. Plaintiffs, in any event, could have terminated the franchises after giving 30 days' notice as of December 4, 1957.

Even assuming that defendants' construction of the termination clauses is correct, the evidence shows that in good faith plaintiffs believed otherwise and were asserting that belief. Defendants on the other hand were asserting their belief to the contrary and threatening to enforce their construction by a law suit. The parties met, discussed their grievances, both being represented by attorneys, and came to a settlement. Applicable to the situation here is a portion of the article on *''Contracts: Restitution and Rescission: Economic Duress and Business Compulsion in California''* in 40 California Law Review, 425, 428. After referring to the doctrine of economic duress as laid down in *Young* v. *Hoagland, supra,* 212 Cal. 426, the article states (pp. 428-429): ''As pointed out in the *Young* case, whether the payments are made voluntarily or involuntarily is nothing more than a determination of whether plaintiff acted as a reasonable man under the circumstances in submitting to defendant's demands. He is expected to use any available legal remedies adequate to protect his rights against the threatened wrong. A person cannot pay money over to prevent an unwarranted forfeiture of a lease, since he has an adequate remedy through a declaratory judgment. Nor can a person later sue on a contract which he has compromised and released in writing. He should have stood his ground at the time and sued on the contract if the threatened breach occurred. In other words, if plaintiff has an adequate remedy which will either prevent the threats from being carried out, as an injunction or a declaratory judgment, or if he can later obtain damages which will fully repair the loss to his business or property

interests if the threats are carried out, he will not have acted as a reasonable man in submitting to the coercion.''

So far as loss of defendants' investment is concerned, the evidence shows that the purposes of the compromise agreement and the extension therein and the later extension until March 1, 1958, was to provide defendants time to find a buyer for the business.

The court found and the finding is supported that plaintiffs attempted in good faith to terminate the basic franchise contracts which attempt defendants resisted, and that thereupon the parties intended to and did settle and compromise all disputes between them then existing, and that defendants entered into the compromise agreement voluntarily.

█ It is not duress or unlawful for a party to threaten to refuse to proceed under a contract nor to threaten to stand suit. (*Sistrom* v. *Anderson* (1942), 51 Cal.App.2d 213, 221 [124 P.2d 372]; *Marshall* v. *Packard-Bell Co.* (1951), 106 Cal.App.2d 770 [236 P.2d 201]; *Leeper* v. *Beltrami*, 53 Cal. 2d 195, 204 [347 P.2d 12].)

█ Defendants also contend that the compromise agreement was without consideration. They argue that it admits that Del Monte, the corporation, holds the franchises and that therefore there could be no consideration in plaintiffs' agreeing to do something which they were already obligated to do, namely, continue the franchises. █ The mutual cancellation of executory rights is sufficient consideration for a new contract. (*Honda* v. *Reed* (1958), 156 Cal.App.2d 536, 539 [319 P.2d 728].) Thus, assuming as defendants argue, that the basic franchise contracts were still executory on June 27, 1957, the mutual surrender of rights thereunder furnished consideration for the agreement of that date.

█ Moreover, the compromise of disputes or claims asserted in good faith constitutes consideration for a new promise. (*Pearsall* v. *Henry* (1908), 153 Cal. 314, 318 [95 P. 154].) "It must be remembered that it is the policy of the law to discourage litigation and to favor compromises of doubtful rights and controversies, made either in or out of court. [Citations.] It is not essential to a valid compromise that the claim in dispute be determined to be a valid one. As long as the claimant is asserting the claim in good faith, a compromise thereof is valid even though it later develops that the claim was not well founded." (*Hamilton* v. *Oakland School Dist.* (1933), 219 Cal. 322, 329 [26 P.2d 296].)

*Grant* v. *The Aerodraulics Co.* (1949), 91 Cal.App.2d 68 [204 P.2d 683], is readily distinguishable from our case. There although the defendant was indebted to the plaintiff in the sum of $7,000, the parties entered into an agreement of cancellation of the original contract upon the defendant agreeing to pay the plaintiff only $1,000 and to release certain rights which the court found were valueless. The general rule that mutual cancellation of executory rights constitutes sufficient consideration was held inapplicable to a situation in which the rights of one party were practically valueless and those of the other were valuable.

Defendants seem to argue that as the compromise agreement in effect incorporated the provisions of the original agreement by a statement to the effect that all of the provisions of that contract "shall be complied with between the parties after the date of this Agreement *and up to and including October fifteenth (15th) 1957,*" (emphasis added) unless terminated by notice of failure to comply or notice given 30 days before the end of a year, that the franchise did not terminate on October 15, 1957, or the extended date, March 1, 1958. However, the language of the compromise agreement is clear. It states that defendants could operate under the basic franchise contracts up to and including October 15, 1957, "*on which date all rights under said bottling contracts shall terminate.*" Thus, the compromise agreement modified the terms of the original agreement as to termination, and by its express terms the franchise was to terminate October 15.

On October 4, 1957, plaintiff Nesbitt wrote Del Monte in answer to the latter's inquiry as to whether Nesbitt intended to withdraw the franchise on October 15, stating that although Nesbitt had some question as to Del Monte's ability to maintain satisfactory distribution of Nesbitt's and Sprig's products, Nesbitt was "agreeable to extending the agreement which expires October 15th" to March 1, 1958. "This gives you an opportunity to determine what can or cannot be accomplished through the winter months." There is nothing in this letter that in anywise contradicts the terms of the compromise agreement other than extending the time of termination to March 1, 1958.

2. Findings.

Finding VI found that the grounds asserted in the June 17 and 18 letters of cancellation "were not frivolous

and were asserted by plaintiffs in good faith.'' Defendants contend that this finding is unsupported. Elliott's testimony (even though, as claimed by defendants, it may be contradictory and controverted), that plaintiffs did not know of the corporation situation, is alone enough to support the finding. The fact that a mortgage executed by Del Monte to the prior owners at the time of its incorporation in November, 1956, was then recorded, does not charge plaintiffs with knowledge of either the mortgage or the corporation. The constructive notice provided by sections 2963 and 1213, Civil Code, applies only to subsequent purchasers and mortgagees. Plaintiffs are in neither category. Finding VI must be taken in connection with finding V to the effect that the facts set forth in the termination notice were unknown to plaintiffs prior to June 4, 1957.

 Defendants contend that some of the findings mix conclusions of law and findings of fact. However, a reading of the findings as a whole leaves no doubt or uncertainty as to the basis of the decision. Further, findings of fact or conclusions do not lose their effectiveness merely because misplaced one among the other. (*Gossman* v. *Gossman* (1942), 52 Cal.App.2d 184, 191 [126 P.2d 178].)

Finding IX found that at no time prior to this action did defendants repudiate the compromise agreement or inform plaintiffs they did not intend to be bound by it. Finding XII found that subsequent to March 1, 1958, defendants continued to distribute plaintiffs' products.

The evidence clearly shows that at no time prior to the termination of the compromise agreement as extended to March 1 did defendants indicate any repudiation of that agreement. While finding IX is inconsistent with finding XII insofar as it relates to the time subsequent to March 1, such inconsistency is unimportant as the critical period so far as finding IX is concerned is the period up to March 1. Finding XII deals with the period after March 1 because of its applicability to injunctive relief.

 Defendants contend that the court failed to find on the rights of the parties under the original agreement and on whether trade custom prevented cancellation of the basic franchise agreements, both of which the pretrial order stated were issues. As to the first, by finding that the compromise agreement was valid and settled the rights of the parties under the earlier agreements, the court at least impliedly

determined the rights of the parties under the earlier agreement. ". . . while full findings are required upon all material issues a judgment will not be set aside on appeal because of a failure to make an express finding upon an issue if a finding thereon, consistent with the judgment, results by necessary implication from the express findings which are made." (*Richter* v. *Walker*, 36 Cal.2d 634, 640 [226 P.2d 593].)

Whether trade custom prevented cancellation of the basic franchise agreements without cause was not an issue in the case. Plaintiffs did not rely on termination under the basic franchise agreements, but under the compromise agreement. Termination under the basic franchise agreements was relevant only insofar as the grounds for such termination were not frivolous and were asserted in good faith, upon which consideration for the compromise agreement could have been based. Moreover, custom may not be adduced to vary a contract certain in its terms. (*Withers* v. *Moore*, 140 Cal. 591, 597 [74 P. 159].) The termination clause of the compromise agreement as well as of the basic agreement was clear and unambiguous. No finding on custom was necessary.

3. Admission of Evidence.

The exhibits objected to were reports to his employer prepared by Elliott. He filled out the printed portion during his visits to defendants' plant and added notations later in the evening. They were admitted under section 1953f, Code of Civil Procedure, as reports made in the regular course of business, Elliott testifying that they were a regular part of his duties. That section grants to the trial court a wide discretion in determining whether a proper foundation has been laid. (*Cole* v. *Ames* (1957), 155 Cal. App.2d 8, 18 [317 P.2d 662].) As to two of the reports defendants made no objection. There was no error here. Moreover, the reports were merely cumulative to Elliott's testimony, and if they were erroneously admitted, there was no prejudice to defendants. (See *Milton* v. *Hudson Sales Corp.* (1957), 152 Cal.App.2d 418, 439 [313 P.2d 936], holding that certain hearsay evidence was not prejudicial as it was merely cumulative to the evidence which was properly admitted.)

The judgment is affirmed.

Tobriner, J., and Duniway, J., concurred.