[Civ. No. 24994. Second Dist., Div. One. July 26, 1961.]

THEODORE FIO RITO, Plaintiff and Appellant, v. MADELYN FIO RITO, Defendant and Appellant.

314

Milton Zerin for Plaintiff and Appellant.

Walter H. Young for Defendant and Appellant.

LILLIE, J.—Plaintiff sued to have the court declare an obligation to sell certain real property within a reasonable time, under a property settlement agreement. Defendant cross-complained to quiet title and reform the agreement, and for declaratory relief and breach of contract. Both parties appeal from the judgment entered against plaintiff on his complaint, but declaring the property settlement agreement to be legal and valid, entered into for valuable consideration and not obtained by duress, and that it does not require defendant to sell the property in question; and in favor of defendant on her cross-complaint quieting title.

Considering first plaintiff's appeal, we view the evidence in connection with the issues raised therein in the light most favorable to defendant. The parties were married in 1935 and divorced in 1950. The property in question, consisting of 30 acres, was acquired in 1941 in two parcels—one, containing approximately one-half of the acreage, was taken in the name of defendant alone; the other half, known as Parcel 1, was taken in the names of both parties in joint tenancy. Plaintiff, a band leader, was earning approximately $35,000 a year in

1943; at that time he was gambling heavily and asked defendant to obtain a divorce. Thereafter, on November 24, 1943, the parties signed a property settlement agreement wherein plaintiff gave to defendant as her sole and separate property, Parcel 1 (p. 2), and pursuant thereto, executed and delivered to her a quitclaim deed covering the same. For reasons involving their 8-year-old son, defendant did not then sue for divorce; but the parties were never thereafter reconciled. Since 1943 they have not lived together as husband and wife, although several times they tried to "patch things up." Neither the 1943 agreement nor the quitclaim deed was ever cancelled or rescinded, and Parcel 1 was never reconveyed.

On March 14, 1946, plaintiff filed suit for divorce and recorded a notice of *lis pendens*. Thereafter, in April, defendant entered into escrow with one Brent for the sale of the property for $120,000, but because of the *lis pendens* she was unable to deliver title; in May, defendant signed a property settlement agreement but plaintiff did not sign it; in July Brent canceled the escrow representing to her that he would again be interested when the cloud was removed. The May property settlement agreement was revised and in September plaintiff signed the same but defendant did not; neither the May nor the September document mentioned a sale of the property or a share of the proceeds. After further negotiations, the parties on November 7, 1946, signed a property settlement agreement under which plaintiff agreed to execute a grant deed to defendant on Parcel 1 "in addition to" the quitclaim deed of 1943; it also provided that "in the event she sells the real property (described therein) . . . and such sale is made for an amount in excess of $100,000, then any excess over said $100,000 . . . shall be divided equally" with plaintiff. (P. 6.) In March 1947 Brent advised defendant he had purchased a ranch in Hidden Valley and was no longer interested in the property; she told plaintiff of the loss of the Brent sale and that she did not thereafter intend to sell. The parties were divorced in Nevada on August 21, 1950.

Plaintiff fell into arrears on child support and alimony under the 1946 agreement; thereafter, a Mr. Clapp representing defendant, prepared a letter dated February 1, 1954 (Exhibit H), which was signed by both parties; it provided among other things, for payment of $4,000 past due child support from certain assignments, payment of monthly child support as it falls due, and that a $12,000 arrearage in alimony would be paid "from any monies which might become due to

you (plaintiff) upon the date of the sale of my ranch as provided in the property settlement agreement heretofore entered into between us.''

Since 1946 defendant has borrowed $120,000, which she put into the property, $60,000 to $70,000 of which went into repairs, taxes and improvements; none of these funds came from plaintiff; and the present value of the property is $300,000. The first time plaintiff asked defendant to sell it was in 1950, she refused; plaintiff consulted a lawyer but did not file suit until six years later, which was not served on defendant until 1960.

Plaintiff's material points on appeal are that the trial court's finding that at the time of the execution of the 1946 agreement the parties did not intend defendant to be under any obligation to sell the real property (Findings of Fact, p. II), is not supported by the evidence; and that the law implies in the 1946 agreement a duty to sell within a reasonable time, which has expired. His argument in support of the first ignores the fundamental rule that in the lower court he, as plaintiff, had the burden of proving his case by a preponderance of the evidence; and further, it is predicated upon evidence which the trial court, in resolving the factual conflicts, obviously rejected as either not credible or as of only slight evidentiary value. And in connection with his second point, a duty to sell within a reasonable period will not here be imposed in the absence of a primary obligation to sell the property.

Plaintiff alleged in his complaint, and it was the theory upon which he tried his case, that at the time of the execution of the 1946 agreement defendant ''did orally and impliedly represent to and promise'' plaintiff she would sell her property at such time as it could be sold for in excess of $100,000 (p. V). Thus, to prevail in the lower court, plaintiff had to prove the affirmative of the issue by a preponderance of the evidence; the record reveals no proof of a representation or promise, oral or implied, that defendant was under any obligation to sell her property at any time, or that the parties mutually intended when they executed the 1946 agreement that defendant should be under such a duty. No mention of the same is found in any of plaintiff's testimony—in fact his case in chief consists only of the 1946 agreement, proof of the value of the property and defendant's refusal to sell; he offered nothing of the circumstances surrounding the execution of the agreement, except briefly on rebuttal. Plaintiff, having

offered no evidence that defendant in 1946, or any other time, orally represented to him she would sell her property, and having failed to sustain his burden of proving that she intended to bind herself to sell—this is sufficient support for the finding against plaintiff on these issues. (*Walbergh* v. *Moudy,* 164 Cal.App.2d 786 [331 P.2d 234].)

Plaintiff does not claim that the property is not vested absolutely in defendant or that he has any present estate therein, nor does he contend that the grant to defendant was conditional or restrictive or that he has any right to reform or rescind the same; but he does assert ''that the deed in question (1946) was made pursuant to a contract (1946 property settlement agreement), and the contract was implicit with defendant's promise to sell the property when a fair market value was in excess of $100,000'' (A.O.B., p. 2). This position is not supportive of any finding in plaintiff's favor for the reason that the deed under which defendant acquired the property was not the grant deed of 1946, executed pursuant to the 1946 agreement, but the deed of 1943; and in any event, the record is barren of any proof that the 1946 agreement was implicit with any promise on the part of the defendant to sell.

It cannot be disputed that half of the property has stood in defendant's name alone since 1941; and plaintiff concedes that, pursuant to the 1943 agreement giving the other one-half to defendant as her sole and separate property, he quitclaimed his joint tenancy interest therein to her in 1943. There is no evidence that this conveyance was not fully executed divesting plaintiff of all his right, title and interest in the property, or that it did not constitute a valid deed making defendant the sole owner of the property; nor is there any proof of a subsequent reconciliation of the parties, or a cancellation or rescission of the 1943 agreement or deed. Regardless of what plaintiff may now contend—that between 1943 and 1946 defendant orally agreed she would reconvey the property to both names if he stopped gambling and brought home some money and that he had a claim arising out of his performance of his part of the agreement—the record shows that since 1943, plaintiff has had no interest in the property and that he acquired none.

The 1946 deed, relied upon by plaintiff as conveying the property to defendant, actually conveyed nothing to her, for it covered no more than the land already owned by her. It legally affected neither the validity of the 1943 conveyance

nor the status of the ownership of the land. That the conveyance is controlled by the 1943 deed, is reflected in the 1946 agreement which not only recognized the existence of the deed, but expressly provided that plaintiff, not in lieu of, but "in addition to a quit claim deed previously executed" by him, execute the grant deed; this did no more than reaffirm the transfer under the 1943 deed, it did not create nor was it intended to create, a new title in defendant. Thus, if any duty to sell the property arises out of the 1946 agreement, the instrument must be considered without reference to the 1946 deed; and in the absence of any express language creating such a duty and any evidence of an oral promise of defendant, if any such obligation exists it must be implied in the agreement. Neither its clear and express language nor the circumstances surrounding its execution support any implication that defendant intended to obligate herself to sell her property when it could be sold for in excess of $100,000, or any other time.

Plaintiff concedes that no patent or latent ambiguity exists in the agreement, that he is not entitled to add, change or alter the same on the grounds of fraud, mistake or lack of consideration, and that he has no right to vary or reform the document; his only theory seems to be that it is "incomplete" and does not "go far enough," thus, the court should add another term consistent with the then intention of the parties— that defendant is obliged to sell when her property can be sold for in excess of $100,000. The record is barren of any substantial proof to support a finding in favor of plaintiff on this issue; in fact the contrary appears from the evidence— the 1946 document, clear and concise in its language, was a full and complete agreement intended by the parties to be a final settlement of all of their affairs leaving nothing thereunder to future determination; and the testimony of defendant discloses that apart from the Brent deal, she at no time ever offered, planned or promised to sell her property.

█ The 1946 property settlement agreement is an integrated contract (*Plumer* v. *Plumer*, 48 Cal.2d 820 [313 P.2d 549]); it provides the intent and purpose of the parties to reach a "full and complete and final settlement and adjustment" of their rights and duties with respect to both property and support (p. 1, line 23-24; p. 2; p. 5; p. 15), that each provision be in consideration of each of the others therein contained, and that the parties waive all rights arising out of the marital relationship except those expressly set out in the agreement (p. 17). The document was prepared and executed

with care and was the third and final result of lengthy negotiations. Thus it would seem that had the parties then intended defendant to be bound to sell her property when it could be sold for in excess of $100,000, they would have expressly so provided; on the contrary, the document clearly states that ''in the event'' defendant sells her property *and* such sale is made for an amount in excess of $100,000, the excess shall be divided (p. 6). This language renders any division of sale proceeds purely conditional—on *two* contingencies—if defendant sells her property, and if she sells it for more than $100,000. Whether she sells it is a matter purely within her discretion.

Plaintiff relies on three pieces of evidence to sustain his claim, but it is manifest that the trial court rejected them either as of little weight or as not credible. The first, is the Clapp letter of February 1, 1954 (Exhibit H); and although plaintiff argues that inasmuch as it provides for payment of $12,000 alimony arrearage out of ''any monies'' which ''might'' become due ''upon the date of sale of my ranch as provided in the property settlement agreement,'' it reflects defendant's intent in *1946* that she would be obliged to sell the property, the circumstances under which the letter was prepared and signed render it of little evidentiary value. First of all, *if* any intent on the part of defendant to sell can be inferred from this document, it is clear that it does not relate to her intent that she be bound to sell her property in the event she is able to sell it for in excess of $100,000; and further, it does not relate to her intent in 1946 to sell, in any event, but relates to her state of mind as it existed on February 1, 1954; second, defendant's primary concern on February 1 was not for the collection of a $12,000 alimony debt, which became unenforceable by virtue of the statute of limitations, but for the settlement of an enforceable $4,000 arrearage in child support and a guarantee that plaintiff would keep up future payments of child support as they fell due; and third, the provision in question means no more than does the original provision in the 1946 agreement, for to interpret the meaning of the language ''sale of my ranch as provided in the property settlement agreement'' it is necessary to refer back in the agreement to the very language in dispute. Under the 1946 agreement plaintiff was obliged to pay for the support of the minor son the sum of $200 per month and for alimony in the sum of $100 per week for a period of two and a half

years or a total sum of $13,000; he fell into arrears—on February 1 he was in default $12,000 for alimony, which claim was not enforceable, it having accrued in full by April 7, 1949, and he was in arrears $4,000 for child support and was not then making child support payments. At that time Mr. Clapp who represented defendant for the purpose of settling the arrearage and obtaining some guarantee that plaintiff would make future payments, met plaintiff at a Hollywood hotel where they discussed the matter. Neither remembers much about the conversation, however they worked out an arrangement whereby plaintiff would make to Mr. Clapp certain assignments amounting to $4,000. Mr. Clapp prepared the letter in question (Exhibit H), gave it to plaintiff to sign, plaintiff signed the same and handed it back to Mr. Clapp and the latter kept the document in his office for two years thereafter. Defendant testified she never authorized Clapp to send the letter to plaintiff and Clapp testified he had no memory that she had authorized him to deliver the same; he did not deliver the letter to plaintiff. Nevertheless it is apparent from the evidence and the letter itself that Clapp on behalf of defendant wanted primarily to settle the arrearage on child support and obtain an assurance from plaintiff that he would keep up future payments for the support of the minor, and in the letter he arranged that plaintiff make good assignments to ASCAP amounting to approximately $4,000 and keep up support payments in the future as they fell due. The $12,000 alimony claim long before accrued and was barred by the statute of limitation, nevertheless plaintiff revived the claim for payment by agreeing that in the event she should sell her property it could be paid out of his share of the proceeds. But we fail to see how such a provision proves that in 1946 she intended to be bound to sell her property or that it confirmed anything more than that to which she had expressly agreed in the 1946 agreement; at most it shows that plaintiff promised that he would pay the claim which was otherwise unenforceable in the event defendant in the future ever decided to sell.

Second, plaintiff refers to certain of his testimony under section 2055, Code of Civil Procedure, that it was his "idea" that defendant was going to sell the property sometime, as indicative of what he intended in 1946 when the agreement was executed. Aside from the fact that the trial court might have rejected this testimony as not credible, or not considered defendant bound by it, it has no bearing on the issue, for the record discloses that plaintiff's "idea," as expressed in his

testimony, referred not to what he thought in 1946, but what he thought in *1950*.

Plaintiff's last reference is to defendant's testimony indicating that she never promised to give plaintiff anything over $100,000 and that it was her understanding that he was to share only in the Brent deal. This testimony appears to be of little value to plaintiff in view of defendant's extensive testimony that she never offered, intended or planned to sell her property to anyone else but Brent and she never agreed with plaintiff that the property would ever be sold.

Plaintiff argues that "since the contract is silent on the particular point in issue when the property should be sold," an agreement to sell within a reasonable time is implied by law, relying on section 1657, Civil Code, *Cousins Investment Co.* v. *Hastings Clothing Co.*, 45 Cal.App.2d 141 [113 P.2d 878], and other cases. No such time provision can here be implied, for, having failed in his proof that a promise to sell when the property could be sold for in excess of $100,000 was implicit in the agreement, no primary obligation to sell, implied or otherwise, has been established. Thus no time limit therefor can be implied under section 1657, Civil Code, which contemplates "the performance of an act required to be performed" before the court will thereunder imply a reasonable time for its performance if no time is specified. In *Cousins Investment Co.* v. *Hastings Clothing Co.*, 45 Cal.App.2d 141 [113 P.2d 878], the contract clearly contained a covenant to do an act. Obviously, the failure to provide in the 1946 agreement a time within which defendant was to sell was intentional because defendant was under no obligation to sell in the first instance. In the cases cited by plaintiff, either there was no dispute as to the principal obligation (*Campbell* v. *Kennedy*, 177 Cal. 430 [170 P. 1107]) or the evidence clearly shows a direct obligation to pay certain money for which the act of selling the property was but an event which determined when the obligation was to become due; in the absence of any time limit the court found an implied covenant to sell within a reasonable time in order to prevent an indefinite postponement of payment of the obligation by refusing to sell the property. (*Weaver* v. *Grunbaum*, 31 Cal.App.2d 42 [87 P.2d 406]; *Estate of Baird*, 59 Cal.App.2d 303 [138 P.2d 698]; *Rapp* v. *Rapp*, 218 Cal. 505 [24 P.2d 161].)

We have already hereinabove determined that the property settlement agreement does not imply a covenant to sell; and we find in the agreement no obligation on the part of defendant

to pay any certain sum depending upon a sale—indeed no obligation to pay anything arises until the contingencies of sale and a sale in excess of $100,000 are met.

Inasmuch as plaintiff's remaining contentions—the issue of damages for breach, statute of limitations, what constitutes reasonable time and whether plaintiff is entitled to a lien on the property—are predicated on an existing contractual obligation, we deem them to be not material to his appeal.

■ Referring now to defendant, she appeals from that part of the judgment declaring the 1946 agreement to be ''a legal and valid Agreement, entered into for valuable consideration, by both parties, and not obtained by fraud, duress, menace or undue influence by either party,'' and denying relief under her cross-complaint. She claims that the trial court should have held the sale provision (p. 6) of the 1946 agreement to be no longer enforceable by plaintiff because of his duress in obtaining the same, and because he breached the covenants therein to be performed by him; and that the finding the contract is a valid and binding agreement is not warranted.

At the outset, we remind defendant that on the trial she had the burden of proving by a preponderance of the evidence the affirmative of the issues of duress and plaintiff's default. It was she who, in her answer and cross-complaint, raised the issues; in the former, she alleged as affirmative defenses that plaintiff had failed to perform his covenants (fifth) and that the agreement was the result of his duress (eighth), all of which she further asserted in her cross-complaint (third cause of action). These matters were factual in nature; as was his duty the trial judge in resolving the factual conflicts determined the credibility of the witnesses and weighed the evidence, concluding that she had failed to prove the issues advanced by her pleadings, and accordingly found against her. We will not disturb the trial court's findings.

On the issue of duress she argues that in 1946 she was in the process of selling her property to Brent when plaintiff filed a divorce action clouding the title, the plaintiff's claim was ''unjustified'' and his action was filed to abort the sale, and that he agreed to and did dismiss the same if she would promise to give him one-half of the Brent deal, to which he was not entitled (A.O.B. 46-48); the duress, she claims, was ''the unlawful detention of the property'' by plaintiff (Civ. Code, § 1569, subd. 2) when he clouded its title by the divorce action.

The factual situation is not as clear cut as defendant would

have us believe, and the record belies her representation that the evidence on the issue is "uncontradicted." Ignoring plaintiff's testimony, she recites certain of her own: that the first information she had concerning the 1946 divorce action was what she read in the newspapers; that the first time plaintiff raised any question about sharing in the proceeds of the Brent sale was between September and November 1946; that at that time, plaintiff said he wanted one-half of the deal over $100,000, he would not remove the cloud so she could sell it, and would make it impossible for her to do anything with it; that she insisted that the property was hers and objected to the divorce action while their son was in Catholic school, but finally told him that if he would dismiss the action she would give him one-half of the Brent deal; and that he then agreed to and did sign the November 1946, agreement. Defendant denied she had ever orally agreed with plaintiff to reconvey the property.

We have heretofore held that there is not sufficient evidence in the record to show that the parties were reconciled after 1943; and it is conceded that neither the 1943 agreement nor the quitclaim deed was cancelled or rescinded. However, for the purpose of defendant's appeal, we are bound to view the evidence relating to the events leading up to the filing of the March 1946, divorce action, bearing on the issue of duress, in a light most favorable to plaintiff. Bearing this in mind, the conflict created by plaintiff's testimony is such as to justify the lower court's failure to find in the defendant's favor (*Walbergh* v. *Moudy,* 164 Cal.App.2d 786 [331 P.2d 234]); in fact there appears to be sufficient evidence, if believed by the trial judge, to affirmatively support the finding.

Plaintiff tells this story: between 1943 and 1946 defendant told him that if he would stop gambling, show good faith and "come back from the road" with some money, she would redeem the property to both of their names; thereafter he sent her money, never less than $400 per week, and returned home in 1945 with $18,000 cash; he gave her $15,000 to invest in the property upon the understanding that she would place the latter in both names; defendant took the money, put it into the property and then refused to reconvey it; he talked to her about this and finally told her that since she was not living up to her agreement to redeem the property after he brought the money home and gave her $15,000, he was going to see a lawyer and sue her, but she did not believe him; he did go to a lawyer and did file suit for divorce in March 1946,

at which time he believed he had some claim to the 30 acres by virtue of her oral promise and the $15,000 he had given her, and filed the action "to establish that"; then, he knew very little about the Brent deal, did not know how much Brent offered, had heard that he was interested in the property as were others but did not then know of an escrow pending; between September and November, during a conference, he told defendant and both counsel, that he did not want to walk out "with nothing" that "she is taking everything away from him"; they then fixed the value of the property at $90,000, but he said, "make it $100,000, but give me something, half of all over $100,000" and he would sign and "get this over with," he "was tired of the whole thing"; defendant's lawyer said, "I think it is all right" and defendant said, "It is all right. It is fair. It is all right"; defendant never told him there was a mistake in the agreement or that he had used undue influence on her or had gotten the agreement by fraud.

If credence be given to this testimony, and it is obvious that on this phase of the case the trial court did not reject it in favor of defendant, it is clear that even though such oral promise may not have been legally sufficient to create an interest in him in the property, that plaintiff nevertheless believed that he had a claim under her promise to reconvey, with which she failed to comply after he returned home with $15,000 which she invested in the property (there can be no doubt that he gave her at least $10,000 for she agreed in the 1946 agreement to repay the same as having been borrowed from him during that period); that after discussions with her about "living up to her bargain" she refused to reconvey the property and he threatened to see a lawyer and sue, and he did—to establish his claim under the oral promise. It might well have been, too, that plaintiff wanted a divorce, he, early as 1943 having asked her for one. It is also apparent that plaintiff did not then know of the escrow (the notice of *lis pendens* was filed a month before the Brent escrow was opened) and had little knowledge of the deal; and that had he filed suit for the purpose of clouding the title and compelling her to share the proceeds, he would not have waited until October or November to mention the same—even defendant concedes that after he filed suit no mention was made of the sale or its proceeds in their negotiations in connection with either the May or September draft, and that the first time it came up was subsequent to September, and that the November agreement mentioned the sale provision for the first time.

The factual situation simply does not warrant the application of section 1569, Civil Code, or the rule that one who falsely clouds the title to real property and then secures some consideration to remove the cloud is guilty of a wrongful act. (*Ezmirlian* v. *Otto*, 139 Cal.App. 486 [34 P.2d 774]; *Wake Development Co.* v. *O'Leary*, 118 Cal.App. 131 [4 P.2d 802]; *Harlan* v. *Gladding, McBean & Co.*, 7 Cal.App. 49 [93 P. 400].) At most the record shows that there was a disputed claim arising out of an oral promise, part of which was executed by plaintiff; that plaintiff asserted a legal position under it which he felt was proper and believed he had a claim against defendant; and that he threatened to sue and did so to establish that claim. It is not duress or unlawful for one to threaten to stand suit or to do so (*Nesbitt Fruit Products, Inc.* v. *Del Monte Beverage Co.*, 177 Cal.App.2d 353 [2 Cal. Rptr. 333]; *Hanford Gas & Power Co.* v. *Hanford,* 163 Cal. 108 [124 P. 727]); and there is no evidence that plaintiff falsely asserted a claim, as in *Leeper* v. *Beltrami,* 53 Cal.2d 195 [347 P.2d 12].

The trial court further found that "said Agreement is a valid and subsisting Agreement." (Findings of Fact, p. V). Defendant claims that the evidence shows that plaintiff breached the covenants of the 1946 agreement to be performed by him and that she was entitled to a finding thereon; that the finding that the agreement is a "subsisting Agreement" is unsupported by the evidence; and that the court should have declared in its judgment that plaintiff is hereafter barred from asserting any rights under the agreement because he is in default thereunder. She predicates her argument primarily on her evidence that under the covenants of the agreement plaintiff is in default of alimony (the full amount having accrued April 7, 1949), has failed to take out, keep and maintain in full force and effect a life insurance policy on his life for the benefit of the son, is in arrears on child support payments and had permitted income tax liens to be filed against the property in question; and asserts the position that "if a husband fails to live up to his support provisions, he is not entitled to any performance of the provisions on the part of the wife." (A.O.B., p. 53.)

Whether plaintiff was in default under the agreement as to bar him from seeking performance of the obligations of the agreement, is a factual question and it is obvious from the findings of fact and judgment that the lower court neither found that defendant sustained her burden of proving the

necessary default under the agreement by a preponderance of the evidence nor found such a default to be material to a determination of the issues herein; and the record supports such a conclusion. Defendant's testimony relative to payments, amounts due, waiver, how much she received from assignments and other sources on behalf of plaintiff is neither uncontradicted nor clear. Inasmuch as a conflict arises in connection with some of these payments it is a matter for the trial court to resolve—thus no useful purpose is served by reviewing the evidence. It is enough to say that from defendant's own evidence it is clear plaintiff could not be in complete default. Further it appears that whether plaintiff's default under the agreement or his conduct amounting to laches and unclean hands are such as to bar him from asserting any rights under the agreement, is at this time of little import, inasmuch as we have held under the agreement that defendant is under no obligation to sell her property when it can be sold for $100,000 or at any time; and defendant has always maintained, and still asserts, she will never sell the property but intends to pass the same on to the son of the parties. Thus, there is now no valid controversy concerning the matter which would justify any declaration to guide subsequent conduct of the parties and there is little likelihood that such a contest will occur in the future. Plaintiff will never be in any position to seek performance of the agreement by defendant unless she changes her mind and decides to sell, in which event by that time (if he is now in arrears under the agreement) plaintiff may no longer then be in default and may with propriety seek enforcement of the agreement in the event she sells and in the event the property is sold for in excess of $100,000, if she does not share the proceeds as provided in the agreement.

For the foregoing reasons the judgment is affirmed.

Wood, P. J., concurred.

Fourt, J., concurred in the judgment.

The petition of the plaintiff and appellant for a rehearing was denied August 15, 1961, and his petition for a hearing by the Supreme Court was denied September 20, 1961.