[Civ. No. 35594. First Dist., Div. One. Aug. 6, 1976.]

LOUISVILLE TITLE INSURANCE COMPANY,
Plaintiff and Appellant, v.
SURETY TITLE AND GUARANTY COMPANY et al.,
Defendants and Respondents.

**COUNSEL**

Tobin & Tobin and John L. Hosack for Plaintiff and Appellant.

Johnston, Miller & Giannini and Faber L. Johnston for Defendants and Respondents.

## OPINION

**SIMS, J.**—Plaintiff, a title insurance company incorporated in Kentucky and duly qualified to do business in the State of California, has appealed from a judgment entered on a verdict in favor of defendants in an action in which it sought to recover on an agreement under which defendant title company, a title company underwritten by plaintiff (see Ins. Code, § 1234.5 and former § 12402), and the latter's president, who held 99.9 percent of its stock, agreed to hold plaintiff harmless from any loss on an appeal bond, or a specific indemnity agreement given by plaintiff to a corporate surety for the issuance of such bond, in connection with a judgment then entered against the title company. Plaintiff has also appealed from an order denying its motion for judgment notwithstanding the verdict. (See Code Civ. Proc., § 904.1, subd. (d).)

The principal issues raised by the pleadings and presented to the jury were (1) whether the agreement entered into by the defendants (then and now referred to as "Surety" and "Macredes") was without legal consideration, (2) whether that agreement was entered into by reason of economic compulsion which plaintiff ("Louisville") brought to bear on the defendants, and (3) whether Louisville suffered any loss within the terms of the agreement. On appeal the plaintiff has undertaken to demonstrate that as a matter of law there was not sufficient evidence to sustain the defendants' contentions that the agreement was unenforceable, and that the evidence compelled a finding that it suffered a loss as a matter of law. Collateral issues raised by Louisville are alleged errors in the exclusion and admission of evidence, alleged errors in the instructions given by the court, and a theory that the defendants were estopped from attacking the validity of the indemnity agreement.

■ In the absence of any special verdicts, we are bound by the rule that where several issues are tried a general verdict will not be disturbed by an appellate court if a single one of those issues, sufficient to sustain the judgment, is supported by substantial evidence and is unaffected by error, even though another issue leading to a similar general verdict and judgment was erroneously submitted to the jury. (See *Gillespie* v. *Rawlings* (1957) 49 Cal.2d 359, 368-369 [317 P.2d 601]; *McCloud* v. *Roy Riegels Chemicals* (1971) 20 Cal.App.3d 928, 935-937 [97 Cal.Rptr. 910]; and *Posz* v. *Burchell* (1962) 209 Cal.App.2d 324, 325-337 [25 Cal.Rptr. 896].) ■ In addition the scope of our review is limited by principles which were enunciated in *Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427 [45 P.2d 183], as follows: "In reviewing the evidence on such

an appeal all conflicts must be resolved in favor of the respondent, and all legitimate and reasonable inferences indulged in to uphold the verdict if possible. It is an elementary, but often overlooked principle of law, that when a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. [Citations.]" (3 Cal.2d at p. 429.)

The applicable rules upon which the plaintiff must rely are found in *Walters* v. *Bank of America etc. Assn.* (1937) 9 Cal.2d 46 [69 P.2d 839, 110 A.L.R. 1259], as follows: "The trial court, in a proper case, may direct a verdict in favor of a party upon whom rests the burden of proof, in this case the plaintiff. Substantially the same rules apply to directed verdicts in favor of plaintiffs as apply to such verdicts in favor of defendants. [Citations.] ▆ A directed verdict may be granted, when, disregarding conflicting evidence, and indulging every legitimate inference which may be drawn from the evidence in favor of the party against whom the verdict is directed, it can be said that there is no evidence of sufficient substantiality to support a verdict in favor of such party, if such a verdict has been rendered. [Citations.] In passing on the propriety of the trial court's action in directing a verdict, the doctrine of scintilla of evidence has been rejected in this state. [Citation.] ▆ A motion for a directed verdict may be granted upon the motion of the plaintiff, where, upon the whole evidence, the cause of action alleged in the complaint is supported, and no substantial support is given to the defense alleged by the defendant. [Citations.]" (9 Cal.2d at p. 49. Accord: *Newing* v. *Cheatham* (1975) 15 Cal.3d 351, 358-359 [124 Cal.Rptr. 193, 540 P.2d 33].)

As outlined below, we find that the trial court erred in applying the law to the uncontroverted facts. The cause of action alleged in the complaint is supported, and no substantial support is given to the defenses alleged by the defendants. This being so our action is prescribed by section 629 of the Code of Civil Procedure which provides in pertinent part: "If the motion for judgment notwithstanding the verdict be denied and if a new trial be denied, the appellate court shall, when it appears that the motion for judgment notwithstanding the verdict should have been granted, order judgment to be so entered on appeal from the judgment or from the order denying the motion for judgment notwith-

standing the verdict." Because the record reflects that plaintiff has made collections which mitigate damages, the matter is remanded to the trial court for entry of judgment for plaintiff for such damages as may be properly established.

Surety Title and Guaranty Company at all times material herein was a corporation organized and existing under the laws of this state carrying on a business as a title company (see Ins. Code, § 12340.3 and former § 12402) in Santa Clara County. Louisville Title Insurance Company at all times material herein was a corporation organized and existing under the laws of the State of Kentucky and authorized to underwrite title insurance for title companies in the State of California. Prior to 1960, Surety's title insurance business was underwritten by Pacific Coast Title Insurance Company pursuant to an agreement executed May 1, 1958. In 1960, because of questions raised in connection with Pacific Coast, the Insurance Commissioner requested Louisville to authorize certain of the title companies underwritten by Pacific Coast, including Surety, to issue Louisville's policies. Subsequently, the commissioner determined that Pacific Coast could not be salvaged, it was liquidated, and Louisville was authorized to negotiate formal underwriting agreements with the title companies formerly underwritten by Pacific Coast.

On December 1, 1962, Louisville and Surety entered into a formal underwriting agreement. Amendments to the agreement were dated September 24, 1973, December 1, 1964, June 1, 1965, and December 1, 1969. On April 1, 1971, Louisville gave Surety written 30-day notice of its intent to cancel the then existing underwriting agreement and the agency of Surety to issue its policies, except as provided in the notice of cancellation and an addendum thereto. The provisions of the underwriting agreement and the amendments thereto which bear on the issues of this case are discussed below.

Sometime in 1962 a claim was made against Surety by A. J. Raisch Paving Co. predicated on Surety's failure to pay that company for paving work in a development. It appeared that the title company had represented to the contractor that it was holding $28,780 for off-site developments, when in fact it only held a check of the developers which was dishonored when presented for payment. Raisch on April 4, 1963, filed an action against United Pacific Insurance Company, the surety on the developer's performance bond, Surety and others. United Pacific filed a cross-complaint against Surety, Tri-Valley Developers, Inc., a corporation, the developer, Sinnot Murphy and Jeanette Murphy the

principals in that development, and sought to foreclose a mechanics' lien upon lots in the subdivision, some of which were the subject of title insurance either issued by Louisville, or assumed by that insurer in taking over some of the business of Pacific Coast. The action was tried in 1965 and 1966 and had been decided adversely to Surety. On March 20, 1968, judgment was entered for $50,246 against Surety and the other defendants, including the foreclosure of the mechanics' lien on some 35 lots, of which more than half had title insurance which was the responsibility of Louisville. Surety was given judgment on a cross-complaint against Sinnot Murphy.

Louisville at one time owned a substantial block of Surety's stock. Defendant Macredes, who had started a program of buying shares in Surety, acquired Louisville's stock and that of other minor shareholders, and gained control of Surety. He became president on February 17, 1964, and by December 1964 he had acquired and retained 34,610 shares, representing 99.94 percent of ownership of the company in April 1968.

On April 1 and 2, 1968, Harrison H. Jones, a senior vice-president of Louisville, and Frank E. Good, apparently its west coast representative, met with Macredes, president of Surety, in San Jose (1) to review Surety's litigation report from 1961 through November 30, 1967, including the Raisch suit, case-by-case in order to define the liability on each case as that of Surety, Louisville, or joint; and (2) to determine the procedure to be followed in subsequent defenses of litigation against Surety or Louisville. Seven other matters discussed, on a total agenda of 11 matters, involved increasing the maximum liability before Surety would be liable for additional premiums for reinsurance, a release of loss guarantee funds, a definition of "negligence" in the contract, the amount to be allowed Surety for litigation expenses it had incurred and the release and satisfaction of a chattel mortgage held by Louisville, the funding of the purchase of a title plant, and the release of Louisville from liability on an appeal bond in pending litigation involving an escrow matter. In addition, Louisville requested information on six additional cases not shown on Surety's list. The parties, as is hereinafter reviewed, also discussed an appeal bond for the Raisch case and their respective liability in that case, and three other pending matters. Finally, a question arose concerning the claims assigned to Louisville by the liquidator of Pacific Coast Title Insurance Company, and the rights and obligations of Surety with respect to those claims which antedated the December 1962 agreement.

Following correspondence, which is reviewed below, the agreement dated May 1, 1968, that is the basis of this action, was executed. Further correspondence led to the execution on May 21, 1968, of an indemnity agreement from Louisville to United States Fidelity and Guaranty Company, which, in turn, assumed liability on an appeal bond in the sum of $75,642 on behalf of Surety in favor of Raisch and United Pacific Insurance.

On March 29, 1971, the Court of Appeal affirmed the money judgments in favor of Raisch and United Pacific. The judgment was reversed, however, with respect to 26 lots in which Surety, along with Tri-Valley Developers, Argonaut Mortgage Company and Argonaut Savings and Loan Association had an interest. After denial of a petition for hearing by the Supreme Court, the remittitur was filed on June 1, 1971. On June 18, 1971, the surety on the appeal bond advised Louisville that demand had been made on it for payment of the judgment; on July 1 Louisville advised the surety that it had requested its attorney to arrange for payment. On July 6 the surety made a formal demand on Louisville. Meanwhile, however, on July 2, the attorneys issued checks to United States Fidelity and Guaranty Company for the respective amounts it was demanding, as of July 6, 1971, for the Raisch and United Pacific judgments. These checks were endorsed by the surety to the judgment creditors and paid. The surety apparently took an assignment from the latter, because it, in turn, assigned the judgments to Louisville on July 6, 1971. The following day the present action was commenced on the May 1, 1968 agreement to recover the sum of $62,064.81 paid over to the surety on the appeal bond. Other facts bearing on the loss allegedly suffered by Louisville are considered below.

## I

■ Since the defendants' theory of economic compulsion is in part dependent upon the assertion that Louisville on May 1, 1968, undertook no more than it was legally bound to do, we first examine the defense that there was no legal consideration for the agreement dated May 1, 1968.

The trial court appropriately instructed the jury that the defendants had the burden of establishing by a preponderance of the evidence that the agreement was entered into without legal consideration. (Civ. Code,

§§ 1614 and 1615.) On the subject of legal consideration it gave the instructions noted in the margin.[1]

There is no serious dispute about the applicable law. ■ "It is an uniform rule of law that a consideration for an agreement is not adequate when it is a mere promise to perform that which the promisor is already legally bound to do. [Citations.]" (*General Motors Accept. Corp.* v. *Brown* (1934) 2 Cal.App.2d 646, 650 [38 P.2d 482]. See also *Pacific Finance Corp.* v. *First Nat. Bk.* (1935) 4 Cal.2d 47, 49-50 [47 P.2d 460]; Civ. Code, § 1605; 1 Williston, Contracts (3d ed. 1957) § 130, pp. 531-534; Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 164, pp. 154-155.) ■ "There can be no doubt . . . that an agreement adding to the terms of existing agreement between the same parties, and by which new and onerous terms are imposed upon one of the parties without any compensating advantage, requires a consideration to support it; though this, of course, may consist either in a new consideration or in some favorable modification of the original contract. [Citations.]" (*Main St. etc. Co.* v. *L.A. Trac. Co.* (1900) 129 Cal. 301, 305 [61 P. 937]. See also *Enslow* v. *von Guenthner* (1961) 193 Cal.App.2d 318, 321 [14 Cal.Rptr. 231]; *Selby* v. *Battley* (1957) 149 Cal.App.2d 659, 664 [309 P.2d 120]; and *Berkowitz* v. *Tyderko, Ltd.* (1936) 13 Cal.App.2d 561, 564 [57 P.2d 173].) In *Grant* v. *The Aerodraulics Co.* (1949) 91 Cal.App.2d 68 [204 P.2d 683], the court ruled: "[T]he elementary rule that a court of law will not inquire into the adequacy of consideration for a contract [citations] does not preclude the necessity of a showing that the consideration has some value at least. [Citations.] It is well settled that something which is completely worthless cannot constitute a valid consideration. [Citations.]" (91 Cal.App.2d at p. 76. See also *City Street Improvement Co.* v. *Pearson* (1919) 181 Cal. 640, 649-652 [185 P. 962, 20 A.L.R. 1317] [overruled on other grounds *Hoffman* v. *City of Red Bluff* (1965) 63 Cal.2d 584, 593-594 (47 Cal.Rptr. 553, 407 P.2d 857)]; *Gifford* v. *Carvill*

---

[1][Defendants' Instruction No. 6]. "In this state every executory contract requires consideration in order to be valid and enforceable. That is to say, that in order to enforce the promise of one person, there must be an act or a promise to do or not to do an act on the other side by another person in exchange therefor. Consideration may be either a benefit conferred or agreed to be conferred upon the promisor or some other person or a detriment suffered or agreed to be suffered by the promisee or some other person."

[Defendants' Instruction No. 6-A as modified]. "When we speak of one promise requiring the consideration of another act or promise in exchange therefor, there are certain limitations to this rule.

"A promise to do that which one is already legally bound to do cannot be consideration for another promise. If a person is already bound by contract to do or perform a particular act, then to specifically promise to do it again would not be sufficient consideration for promises by the other party."

(1866) 29 Cal. 589, 593-594; and *Pacific Rys. Advertising Co.* v. *Carr* (1916) 29 Cal.App. 722, 724 [157 P. 529].)

On the other hand, the recital in the agreement that Louisville's promise to execute a specific indemnity agreement to a corporate surety so that Surety could obtain an appeal bond was given in consideration of the agreements undertaken by Surety in the May 1, 1968, agreement is prima facie evidence that such was the consideration for Louisville's undertaking. (See *Podesta* v. *Mehrten* (1943) 57 Cal.App.2d 66, 71 [134 P.2d 38]; *Cooperative D. League* v. *Hansen* (1937) 23 Cal.App.2d 493, 496 [73 P.2d 627]; and *Fierce* v. *Reed* (1930) 106 Cal.App. 673, 677 [289 P. 855].)

Having in mind the facts giving rise to the execution of the agreement, the following principles are applicable. "It must be remembered that it is the policy of the law to discourage litigation and to favor compromises of doubtful rights and controversies, made either in or out of court. [Citations.] It is not essential to a valid compromise that the claim in dispute be determined to be a valid one. As long as the claimant is asserting the claim in good faith, a compromise thereof is valid even though it later develops that the claim was not well founded." (*Hamilton* v. *Oakland School Dist.* (1933) 219 Cal. 322, 329 [26 P.2d 296]. See also *Pearsall* v. *Henry* (1908) 153 Cal. 314, 318 [95 P. 154, 159]; *Miller* v. *Johnston* (1969) 270 Cal.App.2d 289, 299-300 [75 Cal.Rptr. 699]; *County of Los Angeles* v. *Law Bldg. Corp.* (1967) 254 Cal.App.2d 848, 853-854 [62 Cal.Rptr. 542]; *Nesbitt Fruit Products, Inc.* v. *Del Monte Beverage Co.* (1960) 177 Cal.App.2d 353, 361-362 [2 Cal.Rptr. 333]; *Dominguez Estate Co.* v. *L.A. Turf Club* (1953) 119 Cal.App.2d 530, 541-542 [259 P.2d 962]; and *Baker* v. *Philbin* (1950) 97 Cal.App.2d 393, 397 [218 P.2d 119].) In *Miller* v. *Johnston, supra,* this court reviewed the conflicting principles which have been set forth above, and concluded, "Plaintiffs cannot rely on this principle ["that a consideration for an agreement is not adequate when it is a mere promise to perform what the promisor is already legally bound to do"], first, because they surrendered their rights by a written instrument, and, second, because it cannot be said that their claim to use the triangle was undisputed. The defendants accused plaintiffs of trespassing. Their rights lay in parol subject to establishment by judicial proceedings. The situation is governed by the principle that an agreement to settle a bona fide disagreement is supported by sufficient consideration on each side. [Citations.]" (270 Cal.App.2d at p. 299.)

An agreement to forbear to sue upon an obligation presently due is sufficient consideration to support the debtor's promise. (*Bank of America* v. *Hollywood Imp. Co.* (1941) 46 Cal.App.2d 817, 821-822 [117 P.2d 13].) It has been recognized that "where there is consideration for any of the agreements specified in a contract the contract as a whole cannot be said to lack mutuality or consideration nor can any particular promise or agreement contained therein be singled out and deemed inoperative because no special or particular consideration appears to have been given or promised for it." (*Tennant* v. *Wilde* (1929) 98 Cal.App. 437, 442 [277 P. 137].)

On its face, the agreement reflects that the principal matter addressed was the obtaining of an appeal bond in connection with the Raisch judgment. The recitals so indicate.[2] The undertaking of Louisville is phrased as follows: "Now, THEREFORE, in consideration of the above premises and in consideration of the following agreements LOUISVILLE agrees to execute a Specific Indemnity Agreement to USF&G or some other surety so that an Appeal Bond can be obtained in the amount necessary to allow SURETY to appeal from the decision in the Raisch matter."

Next are set forth certain matters agreed to by Surety in connection with (1) losses arising out of policies of title insurance issued by Surety under its earlier underwriting contract with Pacific Coast, (2) a classification of the claims, which had been listed earlier in April, between those which were the sole responsibility of Surety and three claims for which the parties were jointly liable,[3] (3) the payment of $4,000 on a claim which Louisville had paid in full, (4) the forfeiture of any claims Surety

---

[2]After an introductory clause the agreement recites: "WHEREAS, SURETY has been engaged in litigation in the Superior Court, State of California, in and for the County of Santa Clara, Case No. 144985, styled: A.J. RAISCH PAVING CO. VS. UNITED PACIFIC INSURANCE COMPANY, SURETY TITLE & GUARANTY COMPANY, et al; and

"WHEREAS, on the 20th day of March, 1968, judgment was entered in favor of Plaintiff Raisch and against Defendants, including SURETY; and

"WHEREAS, it is the desire of SURETY to file an appeal on such judgment; and

"WHEREAS, SURETY has requested LOUISVILLE to execute a Specific Indemnity Agreement to USF&G or some other surety so that an Appeal Bond may be obtained by SURETY and so it can make such appeal; and

"WHEREAS, LOUISVILLE is desirous of aiding SURETY in such matter."

[3]This paragraph concluded, "Specifically, SURETY admits to its responsibility of the Kring, designated as Surety Claim No. 63-11, Root (number unknown), *Raisch, designed as Surety Claim No. 62-8,* and Doyle, designated as Surety Claim No. 64-4, claims, and agrees to pay any and all losses in connection with said claims when finally determined." (Italics added.)

had for losses, attorneys' fees, court costs and other expenses attributable to claims for which Surety had the sole responsibility, and (5) acknowledgment that a $40,000 debt represented by four notes was still due Louisville.

For its part Louisville agreed (1) to execute an indemnity agreement so the appeal bond could be obtained, (2) to pay its share of the losses under the three claims for which joint responsibility was acknowledged, (3) to forego any claim for the balance paid out in settlement of the claim on which Surety was to pay $4,000, and (4) to, at the request of Surety, renew and extend, with instalment notes, the demand notes then due. The agreement concludes with the following paragraph which is the basis of this action: "5. It is a further condition of this agreement that SURETY will execute the Appeal Bond on the Raisch matter with the surety company it selects, and SURETY and MACREDES agree to hold LOUISVILLE harmless from any loss on said Appeal Bond or on the Specific Indemnity Agreement LOUISVILLE gives the surety company. Further, the premium for said bond shall be paid by SURETY."

Defendants, challenged to point to the evidence to sustain the implied finding of the jury that there was no consideration for the agreement, state, "Louisville already had a pre-existing legal obligation to do all the things it promised to do under the May 1, 1968 agreement." They refer to the underwriting agreement and the amendments thereto, to an alleged mutual interpretation of that agreement which imposed upon Louisville the obligation to defend at the appellate level, and ancillary thereto to put up an appropriate appeal bond, to the fact that Louisville did direct Surety to its attorneys to handle the appeal, and to the fact that the trial court's judgment in the Raisch matter involved a title matter as well as an escrow matter. An examination of the record fails to sustain the position of defendants. There not only is no substantial evidence to rebut the presumption of consideration for the written agreement, but uncontradicted evidence which shows that there was adequate consideration for the promise to indemnify Louisville, and that, in any event, it was part of a compromise and settlement effected by the parties.

The agreement reflects that for 8 percent of the gross premium of any policy of title insurance, up to $1 million written in its name, Louisville undertook to pay any title insurance loss, or losses, on the policy in excess of, the first $1,000 plus one-half of the next $6,000, or a maximum of $4,000 to be borne by Surety, although paid by Louisville to the policyholder. The provisions concerning litigation read: "Whenever any

suit is brought against LOUISVILLE as a result of any business of AGENT in the issuance of preliminary reports for title insurance, title insurance binders, title insurance policies or other evidence of title, it is agreed that AGENT will join with LOUISVILLE in the defense of such suit and in such cases all reasonable attorneys' fees, costs, expenses and loss or losses incurred therein will be pro-ratably paid in accordance with this contract except as hereinafter set forth. [¶] Notwithstanding the foregoing, AGENT agrees to be solely liable for any attorneys' fees, court costs, expenses and loss or aggregate of losses resulting from: (a) fraud, negligence or misconduct of AGENT, its officers or employees in the performance of its duties as AGENT of LOUISVILLE; (b) escrow loss or losses wherein the AGENT fails to disburse properly or close in accordance with escrow instructions or where such escrow funds are misappropriated by AGENT, its officers or employees." The agreement also required Surety to maintain a reserve fund for title insurance losses,[4] an escrow reserve fund, a fidelity bond covering its officers and employees, and errors and omissions policies covering abstracter's, title insurance agent's and escrow agent's errors and omissions. The foregoing provisions were not materially affected by any amendments made prior to May 1, 1968.

Reference to the provisions of the agreement indicates that it did not cover the Raisch action. Louisville was not made a defendant in that action. From the record it appears that Louisville's sole interest in Raisch's claim would be its possible liability, by reason of the assumption of Pacific Coast's obligations, on title insurance issued on some of the lots which, under the trial court's judgment, were made the subject of the contractor's mechanics' lien. Louisville could and did claim that even if there were a title insurance loss (the appellate court found that there was no lien), the prime responsibility was the negligence of Surety in connection with the escrow, because, if it had held the funds it represented it had on hand, the contractor would have been paid and no claim would have ensued. In any event, the underwriting agreement itself imposed no obligation on Louisville to participate in the Raisch suit, much less undertake to furnish an appeal bond in such manner that it would render itself unconditionally liable for the judgment entered March 20, 1968.

---

[4]By an undated addendum, apparently not applicable in this case, modifications were made in the provisions for a reserve fund, the provisions for the proportion of the premiums payable to Louisville was increased to 10 percent, and the maximum title insurance loss to Surety was reduced to $2,500.

The defendants rely upon the testimony of Jones, the senior vice-president of Louisville, of John Hopkins, a municipal court judge who was formerly with the law firm which handled the Raisch appeal and of Macredes to establish a prior history that, whether a title or escrow matter, an action would be defended at the trial level by Surety's counsel, but if it involved a title matter it would thereafter be handled at the appellate level by Louisville's counsel. Nothing in the testimony of Jones, or Hopkins, establishes that assertion, although Macredes did testify to such an understanding. Assuming that the jury was entitled to find that such a practice existed, it does not follow that Louisville was bound to furnish a defense on appeal where there was a judgment predicated upon both an escrow and a title matter, and it appeared that the proximate cause of the loss was Surety's negligence in handling the escrow. If it be assumed that despite the dispute, Louisville was bound to furnish (although not necessarily to ultimately pay for) such a defense on appeal, the fact remains that it did furnish such a defense. It does not follow, however, that in doing so Louisville was bound to not only furnish an appeal bond but also assume liability for the payment of any judgment which might result from Surety's escrow liability. There is no evidence to support such a past practice, and nothing in the record on that score precluded Louisville from bargaining in good faith for indemnity from Surety, if it, as it did, enabled Surety to secure an appeal bond from the adverse judgment.

Over the objection of Louisville, Macredes was permitted to testify that Louisville's vice-president Good had directed him to the office of Louisville's attorneys to handle the appeal.[5] This evidence was offered, in connection with the evidence reviewed above, to establish an

---

[5]Prior to trial the defendants had moved to disqualify and enjoin Louisville's attorneys from appearing in this action because they had represented Surety in the earlier Raisch litigation. On April 27, 1972, that motion was denied, and on May 4, 1972, the defendants filed an appeal from that order. That appeal had not been pursued up to the time of trial in January 1974. At the outset of the trial Louisville moved for an order excluding any reference, comment or evidence with respect to defendants' claim, asserted in their answer, that the firm represented Surety in the Raisch action. That motion was denied. On appeal Louisville urges that the court erred because, despite the fact of representation of Surety as it appears in the record of the Raisch action, the prior order was res judicata in determining that the firm had not represented either of the defendants in the prior action. Secondly, Louisville contends that it was an abuse of discretion to permit that evidence, because it was extremely prejudicial (see Evid. Code, § 352), as was evidenced by the defendants' confusing and unwarranted argument that implied that there was some duplicity in the firm's assisting Louisville to recover on the indemnity agreement after suffering the affirmance of the Raisch judgment against Surety on appeal, despite the diligent efforts on Surety's behalf. In view of other conclusions expressed herein, that alleged error is not reviewed herein.

admission on the part of Louisville that the judgment evolved out of a title matter for which it was responsible. The record of the *Raisch* case (1 Civ. 26110 - Div. Three) of which we have taken judicial notice under the provisions of section 452, subdivision (d), of the Evidence Code because of the parties' frequent references to that action, reflect that during the long period between the trial court's decision in 1966 when the court rendered its decision and 1968 when findings were settled and judgment was entered, the attorney for Surety, who was also its secretary, died. When proceedings to settle the findings were commenced, the attorneys, whom Macredes identified as Louisville's attorneys, were associated with a former associate of the deceased attorney. Thereafter, they vigorously prosecuted in the trial court and on appeal Surety's claims that the delay in settling the findings was prejudicial because of the death of its attorney, that the court erred in finding Raisch's work was performed and the surety's bond was issued in reliance on Surety's letter, and that the attorneys' fees allowed were excessive. They also, with the attorneys for the financial institution holding loans on the lots, successfully contended that the claimed mechanics' liens were erroneously allowed by the trial court. Even if Macredes' conclusionary testimony be accepted and given all possible inferences in support of the judgment, it fails to establish an agreement or practice whereby Louisville would undertake to assume sole liability to indemnify a surety for an appeal bond for a judgment such as existed in the *Raisch* case.

On the other hand, the record indicates adequate consideration for the agreement dated May 1, 1968. The record reflects that at the time of the April conference, Macredes believed that the *Raisch* case possibly could be a title case. He also testified in 1974 that he at all times was of the opinion that the responsibility for the appeal in that case rested on Louisville. Nevertheless, the record is clear that Louisville at all times considered that the responsibility rested in Surety because of the negligence of its employee handling the escrow. Under date of April 9, 1968, Louisville sent Macredes a memorandum of its officer's summary of the meeting which referred to the foregoing, and added, "JJM [Macredes] is concerned about the appeal over the RAISCH PAVING suit. The matter is to come up shortly for appeal and he volunteered the following proposition: He had requested [us] to take the Appeal Bond position and if we would he agrees that SURETY will be responsible for any loss which may accrue because of said action, also that SURETY would stand fully obligated on the Kring (63-11) and Doyle (64-4) matters, and in exchange for our doing this he would not contend the obligations for matters prior to the 1962 contract and would pay us

$4,000.00 on the RADUNICH matter. I told him we would take this under advisement." The agreement dated May 1 was admittedly prepared by Jones of Louisville, but it apparently was first sent to Surety for review and execution, because on April 19, 1968, Surety wrote Louisville as follows: "Enclosed find the original and three copies of the Agreement between Louisville and Surety. They are sent to you with the understanding that, upon the execution by Louisville, the Agreements will be dated and the 30 days referred to in Paragraph 4 will commence from such date and we shall later advise as to our intentions on the obligations referred to. Please forward two signed and dated copies of this Agreement as soon as possible." The same letter stated, "With reference to your letter of April 9 enclosing your memorandums of the meeting between you, Frank and Jim, the pressure of business has prevented us from providing you with the additional information required in that letter. However, it will be done just as soon as we can find time to do so." No mention was made of any objections to the form and content of either the agreement or the memorandum of what occurred at the April meetings.

The good faith of Louisville's contention that Surety should be responsible for the Raisch judgment was not only exemplified by the terms of the agreement and the evidence which has been reviewed above, but it was also vindicated by the judgment of the court on appeal which struck down the mechanics' lien. Macredes' belief that Louisville was obliged to risk its credit unconditionally to secure a bond is impeached by what the record reflects in respect to another prior action referred to as "Surety Claim No. 64-4. Doyle vs. Surety." The memorandum recites, "LTIC [Louisville] was on the Appeal Bond but is to be released from same by USF&D at such time as USF&D has obtained assignments of passbooks on Savings Account owned by SURETY, previously held by LTIC as collateral. [¶] Said passbooks were turned over to USF&D for such purpose. SURETY has a claim against one Fred H. Clark for fraud. It would appear that this is strictly an escrow matter, however, there is more concerning this matter in the latter part of this memorandum." The memorandum continues, "USF&D will secure assignments of the passbooks, notify the Savings and Loans in which the funds are held that the books have been assigned to them and if this is accomplished will release LTIC from the DOYLE Appeal Bond (Claim No. 64-4). If the passbooks are not assigned as stated above then the passbooks are to be returned to LTIC as its collateral." The uncontradicted record on that transaction makes it clear that Louisville was not undertaking to assume the liability for appeals from judgments arising from escrow errors of Surety.

The memorandum indicates that the three claims for which Louisville acknowledged joint liability were title matters. Two were determined to be such at the conference, and one, which was then left open for further discussion, was assumed as joint in the agreement. It appears that the issue on the last two, and presumably on the others, was whether Surety's negligence in the matter relieved Louisville of responsibility. On a fourth claim, Louisville had paid out $36,000 in the belief, acknowledged by Macredes who denied anything was due, that it had a right against Surety on the claim. The nature of the dispute concerning this claim does not appear, but it is clear that Louisville acknowledged it should be treated as a title claim and waived any right to the excess over Surety's share as measured by the terms of the 1962 contract. On April 30, 1968, Louisville returned two executed copies of the agreement dated May 1, 1968 to Surety and requested payment of $4,000 due on that claim pursuant to the agreement. On May .6, 1968, Surety paid the $4,000 without any protest concerning the terms of the agreement. Finally, it appears that by the agreement Louisville gave Surety an option to renew and place on an installment basis some $40,000 in demand notes which it held and which were then due.

From the foregoing it is clear that the parties embodied in the agreement the terms of such matters as had been settled and agreed upon at their conference in April. There was adequate consideration not only from the writing, but because of the respective obligations assumed by each party. The record fails to support the implied finding of the jury that there was no legal consideration for Surety's and Macredes' agreement to indemnify Louisville in connection with the appeal bond. It was error to submit the issue to the jury, and error to fail to direct a verdict for the plaintiff on that issue.

## II

The trial court gave the instructions on the issue of economic compulsion which are set forth in the margin.[6] Louisville contends that

---

[6]"One may not recover under a contract where the assent of the other person was obtained by economic compulsion. [¶] Economic compulsion is a form of duress whereby a person is induced to agree to something by a threat of action which is illegal and which would cause the other business or economic loss or injury. In this sense, it differs from the usual form of duress which is a threat of bodily harm, but the legal consequences of either type of duress are the same." [Defendants' Instruction No. 7.]

"For economic compulsion, there must be a threat to do a wrongful act. Although one

the instructions were erroneous in that they ignored crucial elements of the compulsion. We have not been referred to any instructions offered by plaintiff which contained a more accurate statement of the law, and comparison of the instructions given with the principles reviewed below reflects no great disparity. Under these circumstances we find no prejudicial error in the instructions as such. (See *Ornales* v. *Wigger* (1950) 35 Cal.2d 474, 481 [218 P.2d 531]; *Downing* v. *Barrett Mobile Home Transport, Inc.* (1974) 38 Cal.App.3d 519, 522-523 [113 Cal.Rptr. 277]; *Marcus* v. *Palm Harbor Hospital, Inc.* (1967) 253 Cal.App.2d 1008, 1018 [61 Cal.Rptr. 702]; and 4 Witkin, Cal. Procedure (2d ed. 1971) Trial, § 194, p. 3013.) Nor do we give weight to Louisville's attempt to distinguish between Surety's and Macredes' respective rights to assert economic compulsion.[7] ■■ The true issue is whether there was sufficient evidence to permit the question of economic compulsion to go to the jury.

---

has no right to breach a contract, a threat not to perform a contract normally will not be a sufficient unlawful act to constitute economic compulsion unless it is not done in good faith. A threatened breach of contract in bad faith with the intent to force another to do something he would not otherwise have been willing to do, can constitute economic compulsion." [Defendants' Instruction No. 7-A.]

"If you should find that the consent of Surety Title and Guaranty and James J. Macredes to the agreement of May 1st, 1968, was obtained by economic compulsion, as I have defined that to you, then I instruct you that the plaintiff may not recover from the defendants in this action." [Defendants' Instruction No. 7-B.]

[7]In its reply brief Louisville suggests that the defense of economic compulsion, if applicable, would only be available to the defendant title company, and not to defendant Macredes, because there is a distinction between a corporation and its shareholders. He relies on cases which rule that a shareholder generally may not sue individually for a wrong done to the corporation (see *Gagnon Co., Inc.* v. *Nevada Desert Inn* (1955) 45 Cal.2d 448, 453 [289 P.2d 466]; *Lewis* v. *LeBaron* (1967) 254 Cal.App.2d 270, 282 [61 Cal.Rptr. 903]; and *Shenberg* v. *DeGarmo* (1943) 61 Cal.App.2d 326, 333 [143 P.2d 74]); cases which indicate that the mere fact that one or two individuals or corporations own all of the stock of another corporation is not of itself sufficient to cause the courts to disregard the corporate entity of the last corporation and to treat it as the alter ego of the individual or corporation that owns its stock (see *Cleaning & P. Co.* v. *Hollywood L. Service* (1932) 217 Cal. 124, 129 [17 P.2d 709]; *Erkenbrecher* v. *Grant* (1921) 187 Cal. 7, 9-11 [200 P. 641]; *Maxwell Cafe* v. *Dept. Alcoholic Control* (1956) 142 Cal.App.2d 73, 78 [298 P.2d 64]; and *Rexall Drug Co.* v. *Peterson* (1952) 113 Cal.App.2d 528, 530 [248 P.2d 433]); and cases which hold that those who have enjoyed a definite relationship with the corporation will be estopped to deny its corporate existence. (*Peterson* v. *Cloverdale Egg Farms* (1958) 161 Cal.App.2d 792, 798-799 [327 P.2d 127]; and *Wynn* v. *Treasure Co.* (1956) 146 Cal.App.2d 69, 76-77 [303 P.2d 1067].) The assumption that Macredes is barred from asserting the same defense as is available to the corporation overlooks the fact that he is asserting the defense for himself as a co-obligor of the corporation. His right is not derivative but exists if he himself were induced to execute the agreement by duress, menace or economic compulsion which threatened his personal interests. (See *Young* v. *Hoagland* (1931) 212 Cal. 426, 431 [208 P. 996, 75 A.L.R. 654]; and *Intl. Fishermen etc.* v. *Stemland* (1950) 97 Cal.App.2d Supp. 931, 934-935 [219 P.2d 554].)

In *Leeper* v. *Beltrami* (1959) 53 Cal.2d 195 [1 Cal.Rptr. 12, 347 P.2d 12, 77 A.L.R.2d 803], the court upheld a complaint to recover money paid out to release a lis pendens filed in an action to foreclose, commenced with knowledge that the debt secured had been paid, in order to coerce a second payment of the debt and force a conveyance of other land at a sacrifice. ▮ The court laid down the following principles: "Under modern law duress is not limited to threats against the person. It may also consist of threats to business or property interests. [Citations.]" (53 Cal.2d at p. 203. See also 13 Williston, Contracts (3d ed. 1970) § 1617, p. 702 et seq.; 1 Witkin, Summary of Cal. Law (8th ed. 1973) Contracts, § 338, pp. 285-286; Note (1952) 40 Cal.L.Rev. 425; and Hurd & Bush, *Unconscionability* (1973) 25 Hastings L.J. 1, 21-27, and cases reviewed below.) The court recognized that the taking of legal action or the threat to take such action cannot constitute such duress. (53 Cal.2d at p. 204. See also *Taylor* v. *Ford* (1901) 131 Cal. 440, 447 [63 P. 770]; *Goldstone-Tobias Agency, Inc.* v. *Barbroo Enterprises Productions, Inc.* (1965) 237 Cal.App.2d 720, 723-724 [47 Cal.Rptr. 347]; *London Homes, Inc.* v. *Korn* (1965) 234 Cal.App.2d 233, 240 [44 Cal.Rptr. 262]; *Fio Rito* v. *Fio Rito* (1961) 194 Cal.App.2d 311, 325 [14 Cal.Rptr. 845]; *Nesbitt Fruit Products, Inc.* v. *Del Monte Beverage Co., supra,* 177 Cal.App.2d 353, 361; *Marshall* v. *Packard-Bell Co.* (1951) 106 Cal.App.2d 770, 774 [236 P.2d 201]; *Sistrom* v. *Anderson* (1942) 51 Cal.App.2d 213, 221 [124 P.2d 372]; *Simmons* v. *Sweeney* (1910) 13 Cal.App. 283, 290 [109 P. 265]; and *Standard Box Co.* v. *Mutual Biscuit Co.* (1909) 10 Cal.App. 746, 761-762 [103 P. 938].) On the other hand if, as was the case in *Leeper* v. *Beltrami,* the action taken or threatened involves the assertion of claims known to be false, the conduct constitutes duress. (*Id.* See also *Young* v. *Hoagland* (1931) 212 Cal. 426, 430-431 [208 P. 996, 75 A.L.R. 654]; *Thompson Crane & Trucking Co.* v. *Eyman* (1954) 123 Cal.App.2d 904, 909 [267 P.2d 1043]; *McNichols* v. *Nelson Valley Bldg. Co.* (1950) 97 Cal.App.2d 721, 722-723 [218 P.2d 789]; *Steffen* v. *Refrigeration Discount Corp.* (1949) 91 Cal.App.2d 494, 498 [205 P.2d 727]; and *Intl. Fishermen etc.* v. *Stemland* (1950) 97 Cal.App.2d Supp. 931, 934-935 [219 P.2d 554].)

▮ The court stated that it was undoubtedly the law that if the party claiming coercion had a reasonable alternative to parting with the consideration to satisfy the false claim, the payment made, and, presumably, any promise given, was not rendered under duress. (*Id.* See also *London Homes, Inc.* v. *Korn, supra,* 234 Cal.App.2d 233, 239-240; *Nesbitt Fruit Products, Inc.* v. *Del Monte Beverage Co., supra,* 177 Cal.App.2d 353, 360-361; *Western etc. Oil Co.* v. *Title Ins. & Tr. Co.* (1949) 92 Cal.App.2d 257, 265 [206 P.2d 643]; and *Texas Company* v.

*Todd* (1937) 19 Cal.App.2d 174, 187-189 [64 P.2d 1180].) The determination of whether there is a reasonable alternative is made by ascertaining as a question of fact whether a reasonably prudent person would follow the alternative course. (*Id.,* pp. 204-205. See also *Young* v. *Hoagland, supra,* 212 Cal. 426, 431; *Thompson Crane & Trucking Co.* v. *Eyman, supra,* 123 Cal.App.2d 904, 910; *McNichols* v. *Nelson Valley Bldg. Co., supra,* 97 Cal.App.2d 721, 723; *Western etc. Oil Co.* v. *Title Ins. & Tr. Co., supra,* 92 Cal.App.2d 257, 266; *Steffen* v. *Refrigeration Discount. Corp., supra,* 91 Cal.App.2d 494, 497-498; and *Intl. Fishermen etc.* v. *Stemland, supra,* 97 Cal.App.2d Supp. 931, 934.)

It is also stated, "The issue in each instance is whether the defendant intentionally exerted an unlawful pressure on the injured party to deprive him of contractual volition and induce him to act to his own detriment. [Citations.]" (*Goldstein* v. *Enoch* (1967) 248 Cal.App.2d 891, 894-895 [57 Cal.Rptr. 19]. See also *Sistrom* v. *Anderson, supra,* 51 Cal.App.2d 213, 221.)

 The record fails to reveal substantial evidence to support, within the foregoing principles, the jury's implied finding that the defendants should be relieved of their obligations under the May 1, 1968, agreement because of economic compulsion.

Defendants rest on the testimony of Macredes. He testified that although there were opportunities for Surety to settle the *Raisch* case in the long interval between the trial court's decision and the entry of judgment, he refused to do so because he did not believe that either Surety or Louisville should be held liable for the bad judgment of someone in writing a letter, when the real loss of the contractor stemmed from the fact that the title company's customer's check was dishonored. He was of the opinion that Raisch never should have won in the trial court. Nevertheless, in the first part of April he knew that if an appeal bond was not posted, the contractor and the developer's surety would levy on Surety's assets to satisfy the judgments. Although Surety had sufficient cash on hand to pay the judgment, payment would have left it without sufficient working capital, and with less cash on hand than was required by regulations of the insurance commissioner, so that it would in effect have to go out of business.

When Macredes contacted his insurance agent he was told that the bonding company wanted his personal financial statement before they

would accept his application for, and his guaranty on, an appeal bond for Surety. He refused to do so because he felt it was Louisville's obligation to procure the bond, and he requested Louisville to furnish the indemnity to the bonding company. At the meeting in April Louisville insisted that he and Surety furnish it indemnity as a condition of the furnishing indemnity to the bonding company. Although Macredes believed that Louisville was obligated to furnish an appeal bond (cf. part I above), he reluctantly acquiesced in the terms it demanded because it threatened to cancel the underwriting agreement. He testified that at the April meeting, Good, the west coast representative of Louisville threatened to cancel the underwriting agreement. He referred to it as "the meeting where I got the hatchet." He understood that he would either do what was requested or else he would be cancelled out. Although in 1971, when the agreement was actually cancelled, he had no difficulty in securing another underwriter within the 30-day cancellation period, in April 1968 he felt he was going to have his doors locked up and he was through.[8] Macredes testified that the threat was made under the following circumstances, "After hours of conversation which on the surface was all amicable and at the last moment when I refused to do so [agree to the terms subsequently incorporated in the agreement], Mr. Good rose and said, 'I guess it is time for us to go. We will cancel.' Mr. Jones said, 'No, wait a minute,' and then we started over again."

---

[8]Macredes testified as follows concerning the circumstances under which the agreement was negotiated, "Well, this agreement was the result of the necessity to post the appeal bond in the Raisch matter. That precipitated this agreement. It was a result of two days meeting in my offices with the principal people of Louisville, Mr. Jones and Mr. Good, sort of a laborious meeting but sort of a useless meeting because I knew what was going to happen in the end. They had an axe to grind and they got it done. If I had not signed this and Raisch had taken execution, they would have virtually stripped Surety's bank account and put us out of business. This at least gave us time and there was, I felt, a distinct possibility of overturning that judgment in the upper court in any event and coming up scot-free.

"I maybe sort of hung my hat on the moral behind this whole thing, Surety nor Louisville either one was responsible for this.

"Conversely, we were in the title insurance business and we did have a contract between ourselves. I was responsible for a certain area of it as was Louisville responsible for a certain area of it. But that is all sort of beside the point.

"At the time of that meeting, Louisville came here with the idea they were going to extract from me what they could, reduce to writing and push me to the brink, which is what happened. The net result of this two laborious days was the signature for this agreement.

"I think it was sort of an afterthought of Louisville to get me to sign this individually.

"As I look at this thing, it appears that this was me individually was sort of an afterthought. The whole thing is pretty incongruous.

"If they had done reasonably what they were supposed to do under the terms of the contract, none of this would have happened. It would have been taken care of."

Good could not recall telling Macredes that his underwriting agreement would be cancelled. Macredes further testified that Good had first threatened to cancel the agreement in 1966 because Surety was not complying with Louisville's justifiable requirement that it obtain a title plant, and that there had been a half a dozen times when Good threatened to cancel because he wanted something done by Surety. He described it as "Sort of a game, really."

The crux of the matter, accepting Macredes' testimony as we must, is whether the threat to cancel was wrongful or made in bad faith. Macredes testified that at that time he did not believe the underwriting agreement had a 30-day cancellation clause in it. He was of the opinion that at that time, other than provisions for summary cancellation for cause, there was a six-month period of time before a cancellation could be effective. Reference to the agreements reflects that in the original, dated December 1, 1962, the parties agreed as follows: "This agreement may be cancelled by LOUISVILLE or AGENT upon the giving of thirty (30) days written notice of intent to cancel, subject, however, to such rights of summary cancellation as follows."

On September 24, 1963, that provision was amended to read, "This agreement shall remain in full force and effect for a period of five (5) years from September 24, 1963, and shall be automatically renewed for another five (5) year period at the expiration of the first five (5) year period unless either party shall give notice in writing to the other party of its intent not to renew the contract within sixty (60) days prior to the expiration of the first five (5) year period."

On December 1, 1964, the 1963 amendment was cancelled in its entirety, and the original agreement was amended to provide, "This Agreement shall remain in full force and effect for a period of six (6) months from the date of the execution of this Amendment."

At the expiration of the six-month period provided in the last amendment, an amendment dated June 1, 1965, was prepared and signed by Louisville. It restored the language found in the original agreement.

On December 6, 1966, Surety requested Louisville to confirm to the former's auditors that the current underwriting agreement consisted of the agreement dated December 1, 1962, with an undated addendum, as amended September 24, 1963, December 1, 1964 and *June 1, 1965* (italics

added). Subsequently, in the amendment dated December 1, 1969, and again on December 22, 1970, in a request for confirmation to the auditors, the June 1, 1965 amendment was referred to as part of the underwriting agreement in force.

The copy of the amendment dated June 1, 1965, produced by Louisville was not signed on behalf of Surety. It was acknowledged that the amendment of December 1964 was made at Macredes' request in connection with his purchase of Louisville's stock, because he wanted to be sure that Surety would have an underwriter for at least six months. Although Louisville's officer could not recall such a conversation, Marcredes testified that he consistently refused to sign the June 1, 1965, agreement because it restored the 30-day cancellation clause.

On that record it would appear that Surety at all times conducted itself as though the 1965 amendment was in effect. If it was not in effect each party's rights and obligations expired six months from December 1, 1964, and either could terminate the agreement at will. Macredes' subjective belief concerning the terms of the contract could not change what actually was done. In any event, under his interpretation of the contract, it was in fact cancellable, and the only question was whether he was entitled to three or six months' notice.

Furthermore, the uncontradicted evidence compels the conclusion that Louisville's assertion of the right to cancel was made in the good faith belief that after June 1, 1965, each party's right to cancel was governed by the clause contained in the original agreement. On the record there is no evidence of a wrongful act or of bad faith which is a predicate to a right to assert economic compulsion. It is well established that the threat of a lawful right to terminate a franchise is not economic compulsion which will serve to invalidate a resulting agreement. (See *Nesbitt Fruit Products, Inc.* v. *Del Monte Beverage Co., supra,* 177 Cal.App.2d 353, 359-361; *Marshall* v. *Packard-Bell Co., supra,* 106 Cal.App.2d 770, 774; and *Texas Company* v. *Todd, supra,* 19 Cal.App.2d 174, 187-188.)

 In order to establish Louisville's bad faith, defendants advert to the claim that Louisville was attempting to have the defendants assume responsibility for something it was bound to do. As we have seen (part I) there is no merit to that assumption. They also assert that the threat of cancellation was made in bad faith to get Surety to relinquish a valuable right to recover litigation expenses expended over a lengthy period of

time on Louisville's behalf. The record in fact shows that the question of the amount of litigation expenses incurred by Surety in defending cases subject to the underwriting agreement was expressly left open. The parties did agree that Surety would be responsible for such expenses on policies which had been written under its contract with Pacific Coast irrespective of the fact that Louisville may have taken over some of that company's title insurance liability when it failed, and that Surety would be responsible for such expenses as it incurred in connection with claims for which it had the sole responsibility. The letter of April 9, 1968, from Louisville to Macredes, expressly directed attention to matters on which he was to furnish further information and the memorandum recites that Macredes was to furnish the data concerning litigation expenses incurred on claims in which the two parties were jointly liable under the 1962 agreement. The prospect of settling that issue was again mentioned in the ensuing correspondence. These claims were subsequently made the subject of a cross-complaint for $100,000 in this action. It was dismissed without prejudice at the outset of the trial, and apparently asserted in another action pending between the parties.

Parenthetically we also observe that the exigencies of the situation might have induced a reasonable man to succumb to the threat, rather than to permit his business to go under. Nevertheless, the absence of a note of protest in the ensuing correspondence, or in complying with other terms of the agreement, and the failure to attempt to set aside the agreement until more than three years after it was executed tend to reduce to unsubstantiality the claims now made by Macredes. Be that as it may, the fact remains that the threat upon which defendants rest their case was a threat to do no more than Louisville was entitled to do. Macredes unsupported views concerning the obligations of Louisville under the underwriting agreement as amended, and concerning his rights under the cancellation clause do not furnish substantial evidence to support the implied finding of the jury that Louisville was proceeding wrongfully or in bad faith in the negotiations which led to the execution of the May 1, 1968, agreement. The trial court erred in submitting the matter to the jury.

## III

Preliminarily we note that Louisville claims the court erred in the instructions given on the issue of whether or not it suffered a loss,[9] and

---

[9]The instructions properly placed the burden of proof on Louisville to establish a loss under the agreement of May 1, 1968. The court specifically charged: "In the

that it erred in excluding the tendered testimony of its vice-president concerning the meaning of the word "loss" as used in the agreement he drafted. (Cf. *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37-41 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; *Masterson* v. *Sine* (1968) 68 Cal.2d 222, 224-225 [65 Cal.Rptr. 545, 436 P.2d 561]; *Roberts* v. *Reynolds* (1963) 212 Cal.App.2d 818, 825 [28 Cal.Rptr. 261]; and *Weaver* v. *Grunbaum* (1939) 31 Cal.App.2d 42, 47-48 [87 P.2d 406], with *Laux* v. *Freed* (1960) 53 Cal.2d 512, 523 [2 Cal.Rptr. 265, 348 P.2d 873] (cf. Traynor, J. concurring, pp. 525-527); *People* ex rel. *Dept. of Parks and Recreation* v. *West-A-Rama, Inc.* (1973) 35 Cal.App.3d 786, 790-793 [111 Cal.Rptr. 197]; *Houghton* v. *Kerr Glass Mfg. Corp.* (1968) 261 Cal.App.2d 530, 533-538 [68 Cal.Rptr. 43]; *Wm. E. Doud & Co.* v. *Smith* (1967) 256 Cal.App.2d 552, 557-559 [64 Cal.Rptr. 222]; and *Wilham B. Logan & Associates* v. *Monogram Precision Industries* (1960) 184 Cal.App.2d 12, 15-17 [7 Cal.Rptr. 212].) In view of the conclusions reached on the issue of loss it is unnecessary to pursue those questions, other than as noted below in connection with the instructions.

 There is no dispute concerning the facts of the payment made by Louisville after the judgment in the Raisch action became final. Defendants' references to Louisville's officer's mistaken and explained expression of intent to sign a bond rather than an indemnity agreement, and to the fact that the appeal bond was in a form not requiring the signature of the judgment debtor or anyone else, tend to obfuscate rather than clarify the legal rights and obligations of the parties. The same is

---

interpretation of a contract of indemnity, unless a contrary intention appears, where the indemnity is against a loss, the corporation indemnified is not entitled to recover without actual payment of such a loss." [Defendants' Instruction No. 4-A.]

"In the present case the agreement between plaintiff Louisville Title Insurance Company, Surety Title and Guaranty Company and James J. Macredes dated May 1, 1968 is the type of indemnity agreement that indemnifies against actual loss either on the appeal bond, or on the specific indemnity agreement that Louisville gave to the bonding company, and is not an indemnity against liability." [Defendant's Instruction No. 4-B.]

After defining a judgment and some of its incidents, the court continued, "In this case, there was a money judgment for damages, and an appeal bond put up by United States Fidelity and Guaranty Company to guarantee payment of that judgment in the event that it was affirmed wholly or partially on appeal, and if the principal debtor failed to pay the same within thirty days after the appeal was final.

"The indemnification embodied in the agreement of May 1, 1968, was from any loss to Louisville on that appeal bond, or any loss to Louisville on the specific indemnity agreement Louisville gave to United States Fidelity and Guaranty Company.

"Such a loss means actual payment by Louisville to U.S.F. & G. and reimbursement for such sums, if any, as said U.S.F. & G. was required to pay in satisfaction of the judgment for which the appeal bond was given, including reasonable attorney's fees and court costs and interest." [Defendants' Instruction No. 4-D as modified.]

true, as demonstrated below, with respect to their attempt to show that Louisville's taking of an assignment of the judgment, and acting to mitigate damages, indicate it suffered no loss. Defendants have confused their promise to pay any loss occasioned to Louisville by its liability under the indemnity agreement given to the bonding company, with a promise, not so conditioned in this case, to pay any loss which Louisville might suffer, if, after paying the bonding company, it failed to secure reimbursement from others liable on the judgment. Confusion has been engendered by the failure of the defendants and the trial court to analyze and distinguish between the three indemnity agreements involved in this case, i.e., the bonding company's agreement to indemnify the judgment creditors, Louisville's agreement to indemnify the bonding company, and the defendants' agreement to indemnify Louisville.

When the judgment became final and Surety, after demand from the bonding company, failed to pay the judgment, the bonding company was bound to pay the amount of the judgment to Raisch and United Pacific at the expiration of 30 days. (See Code Civ. Proc., § 917.1; and *Meredith* v. *S.C.M.A. of Baltimore* (1882) 60 Cal. 617, 619.) In the case last cited the court stated: "[W]hen the sureties to the undertaking on appeal agreed that, in case of the affirmance of the judgment, or of any part of it, by the appellate Court, and of its nonpayment by the judgment debtor, judgment might be entered also against them, in the Court from whose judgment the appeal was taken, according to the law under which the appeal was taken, they, in legal effect, voluntarily made themselves parties to the action, and submitted themselves to the jurisdiction of the Court." (60 Cal. at p. 619.) It was not necessary that the bonding company subject itself to proceedings in court. "A surety who has assumed liability for payment or performance is liable to the creditor immediately upon the default of the principal, and without demand or notice." (Civ. Code, § 2807. See *Somers* v. *United States F. & G. Co.* (1923) 191 Cal. 542, 546 [217 P. 746]; and *Fidelity & Deposit Co.* v. *Whitson* (1960) 187 Cal.App.2d 751, 757 [10 Cal.Rptr. 6].)

"The position of a surety on an undertaking on appeal is . . . similar to that of an ordinary surety on an obligation, who has been regularly joined as a party defendant." (*LaFleur* v. *M. A. Burns Lumber Co.* (1922) 188 Cal. 321, 325 [205 P. 102].) The bonding company had the right to compel Surety, as principal on the bond, to pay the judgment. (Civ. Code, § 2846. See *Josephian* v. *Lion* (1924) 66 Cal.App. 650, 657 [227 P. 204].) When the judgment creditors were paid it had a right against Surety, as principal, to be reimbursed for what was paid to the judgment

creditors, and as well necessary costs and expenses (Civ. Code, § 2847), and a right to enforce every remedy which the judgment creditors had against Surety and Surety's codefendants. (Civ. Code, §§ 2848 and 2849. See *United States Fire Ins. Co.* v. *Johansen* (1969) 270 Cal.App.2d 824, 832 [76 Cal.Rptr. 174, 780].)

In *LaFleur* v. *M. A. Burns Lumber Co., supra,* the judgment debtor contended, as does Surety in this case, that the payment of the judgment creditor by the surety on the appeal bond extinguished the judgment. The court reversed an order of the trial court which had granted the judgment debtor's motion to enter satisfaction of judgment. It stated, after discussing cases which had recognized the equitable right of an obligor who had paid a judgment creditor, to enforce the judgment against his co-obligors, "Inasmuch as the position of a surety on an appeal bond is similar to that of any surety who is jointly liable with the principal, these cases are pertinent to a determination of the rights of the bonding company in the case at bar. No judgment has been entered against that company, but there is no reason why it might not anticipate such entry, pay the amount of the judgment, and take an assignment of it, instead of claiming the benefit of it under section 709 of the Code of Civil Procedure." (188 Cal. at p. 326.) The court concluded, "Therefore, the bonding company, as the assignee of the judgment, is entitled to the benefit of it to collect the amount due, and hence the order that satisfaction be entered was erroneous." (*Id.,* p. 327. See also *McBeth & Compton* v. *McIntyre* (1880) 57 Cal. 49, 50.)

The indemnity agreement executed by Louisville required it "to at all times save harmless and keep indemnified the said Surety, its successors and assigns, against any and all claims, suits, actions, debts, damages, costs, charges and expenses, including court costs and counsel fees at law or in equity, and against all liability, losses and damages of any nature whatever, which the said Surety, its successors and assigns, shall or may at any time sustain or be put to by reason of the execution by the Surety of such bond, . . ." When the bonding company's liability on its bond was established it was entitled to call on Louisville to satisfy its obligations to the judgment creditors. "Upon an indemnity against liability, expressly, or in other equivalent terms, the person indemnified is entitled to recover upon becoming liable; . . ." (Civ. Code, § 2778, subd. 1. See also *McBeth & Compton* v. *McIntyre, supra,* 57 Cal. 49, 50; and *Alberts* v. *American Casualty Co.* (1948) 88 Cal.App.2d 891, 899, 900-901 [200 P.2d 37].) The checks issued to the bonding company by Louisville's attorneys on its instructions, against funds to be and actually remitted by Louisville, and

the endorsements thereon which show negotiation by the bonding company to the judgment creditors' attorneys, and payment of the checks on presentment, establish Louisville's loss on the specific indemnity agreement it gave the bonding company, pursuant to the May 1, 1968 agreement executed by the defendants. (See *Fidelity & Deposit Co.* v. *Whitson* (1960) 187 Cal.App.2d 751, 757 [10 Cal.Rptr. 6]; *Metropolitan Casualty Ins. Co.* v. *Stone* (1932) 124 Cal.App. 430, 437 [12 P.2d 665]; and *Tulare Power Co.* v. *Pacific S. Co.* (1919) 43 Cal.App. 315, 325-327 [185 P. 399].)

When Louisville satisfied the claim of the bonding company to be indemnified for its obligation to pay the judgment creditors, it succeeded to all of the rights of the bonding company which have been outlined above, including the right to enforce the judgment against those liable thereon. (See Civ. Code, §§ 2847, 2848, 2849; and *United States Fire Ins. Co.* v. *Johansen, supra,* 270 Cal.App.2d 824, 832.) There is no merit in the defendants' contention that Louisville then suffered no loss because it acquired a judgment which was worth the amount it paid over to the judgment creditors through the bonding company. The defendants point to the assignment of the judgment from the bonding company to Louisville. It recited, "Whereas on July 6, 1971, for value received, United Pacific Insurance Company, sold, assigned and transferred to United States Fidelity and Guaranty Company all of its right, title and interest in such Judgment. . . ." and "Now, therefore, for value received, Assignor [the bonding company] hereby sells, assigns and transfers to Assignee [Louisville] all its right, title and interest in such Judgment . . ." They claim that since Jones considered the value given to be the sum of $62,064.81 paid out by Louisville, that the judgment must have been worth that sum. That argument is specious. It is obvious that the sum was paid not for the value of the judgment as a chose in action, but to discharge the liability of Louisville for that sum, which was owed by the bonding company on the appeal bond, and, in turn, by Louisville on the specific indemnity agreement. Macredes testified that in July 1971, when Louisville "purchased" the judgment, and at the time of trial the judgment was worth the sum paid out by Louisville on the specific indemnity agreement. In view of the fact that at the time of trial, two and one-half years later, the judgment remained unsatisfied, Macredes' testimony must be considered as referring to the face value of the judgment, or to the amount which one, not liable on the judgment as a principal, could seek to enforce it for. In the light of the record it is not, as was and is urged by defendants, substantial evidence that the

judgment, as a chose in action, was worth the sum due at the time the judgment creditors were paid by Louisville.

General principles relied upon by defendants are found in *Gribaldo, Jacobs, Jones & Associates* v. *Agrippina Versicherunges A. G.* (1970) 3 Cal.3d 434 [91 Cal.Rptr. 6, 476 P.2d 406], an opinion of this court approved and adopted by the Supreme Court. The opinion states, ". . . [W]e observe, initially, that the subject undertaking constitutes a contract of indemnity as against loss or damage, rather than indemnity against liability. [Citation.] As noted in *Ramey* v. *Hopkins,* 138 Cal.App. 685, 689 . . . the distinction between an indemnity against liability and an indemnity against loss is that in the former the essence of the contract is that the event shall not happen while in the latter the indemnity is against the consequences of the event if it should happen. Accordingly, the trial court properly invoked the rule of interpretation provided for in subdivision 2 of section 2778, applying to an indemnity against claims, rather than subdivision 1 of that section applying to an indemnity against liability.

"Subdivision 2 of section 2778 provides that 'Upon an indemnity against claims, or demands . . . or costs . . . the person indemnified is not entitled to recover without payment thereof.' This rule of interpretation was properly utilized by the trial court in finding that 'The obligation of UNDERWRITERS under the policy arises only if the liability of plaintiffs is fixed and plaintiffs discharge the liability by payment. and only if such payment by plaintiffs exceeds the deductible amount of $2,500.00.'

"Although it is true that the word 'claim' connotes an assertion of a legal right and includes within its meaning a money demand [citations], an indemnitor is not liable for a claim made against the indemnitee until the indemnitee suffers actual loss by being compelled to pay the claim. [Citations.]" (3 Cal.3d at pp. 446-447. See also Civ. Code, § 2778; *Fernandez* v. *Tormey* (1898) 121 Cal. 515, 518-519 [53 P. 1119]; *Willson* v. *McEvoy* (1864) 25 Cal. 169, 172-174 [overruled on other grounds *Reachi* v. *National Auto. & Cas. Co.* (1951) 37 Cal.2d 808, 814 (236 P.2d 151)]; *San Pedro Properties, Inc.* v. *Sayre & Toso, Inc.* (1962) 203 Cal.App.2d 750, 756 [21 Cal.Rptr. 844]; *Alberts* v. *American Casualty Co.* (1948) 88 Cal.App.2d 891, 898-899 [200 P.2d 37]; *Globe Indemnity Co.* v. *Larkin* (1944) 62 Cal.App.2d 891, 894 [145 P.2d 633]; *Ramey* v. *Hopkins* (1934) 138 Cal.App. 685, 688-689 [33 P.2d 443]; *Adler* v. *Sawyer* (1919) 40

Cal.App. 778, 781-782 [181 P. 817]; and *Treloar* v. *Keil & Hannon* (1918) 36 Cal.App. 159, 168-169 [171 P. 823].)

As we have seen Louisville's loss was suffered when it paid out the sums necessary to satisfy its obligation under the specific indemnity agreement. The instructions given by the court were correct statements of the principles of law involved, but there was no substantial evidence to show that Louisville did not suffer the loss contemplated by the May 1, 1968 agreement. The uncontradicted evidence shows such a loss. The trial court erred in interjecting the issue of whether Louisville had suffered any loss on the judgment. It never guaranteed that the judgment could be collected from others than Surety.

There was no loss of rights because Louisville, after the defendants failed to reimburse it pursuant to the terms of the May 1, 1968 agreement, exercised its rights as a surety who had paid the debt of another. In fact if it had not attempted to collect on the judgment from others who were liable, it might have been accused of prejudicing the rights of the defendants as indemnitors. (See *United States Fire Ins. Co.* v. *Johansen, supra,* 270 Cal.App.2d 824, 832; and *Massachusetts Bonding etc. Co.* v. *Osborne* (1965) 233 Cal.App.2d 648, 657-664 [43 Cal.Rptr. 761].) It was guilty of no wrong in levying on the assets of Surety, because it was liable as a principal on the judgment. (See *LaFleur* v. *M. A. Burns Lumber Co., supra,* 188 Cal. 321, 327.)

Whatever collections have been made by Louisville in order to mitigate the loss it suffered in paying over the amount due on the judgment must be credited against the sum otherwise due from the defendants. The defendants on satisfying Louisville's claim will also succeed to whatever rights the bonding company, and, in turn, Louisville, had against those otherwise liable on the judgment. (See *United States Fire Ins. Co.* v. *Johansen, supra,* 270 Cal.App.2d 824, 832.)

IV

In view of the conclusions on the foregoing points it is unnecessary to consider Louisville's contention that the defendants' breach of a duty of good faith and fair dealing prevents them from eluding their obligation to Louisville, on some theory of estoppel. There is evidence which indicates that Surety was unable to meet its obligations under the *Raisch* judgment, and later went out of business because it had reduced its working capital by loans to other enterprises in which Macredes was

interested, so that he in effect diverted funds which could have been applied by Surety. No opinion is expressed in the facts or law involved in that theory.

## V

We cannot tell from the record whether or not the amount now due can be computed from uncontradicted evidence in the record. If so, judgment should be entered in that sum for Louisville. (See *Nuffer* v. *Insurance Co. of North America* (1965) 236 Cal.App.2d 349, 353 and 363 [45 Cal.Rptr. 918]; and *Wayland* v. *Latham* (1928) 89 Cal.App. 55, 68-69 [264 P. 766].) On the other hand, if the net amount due on the indemnity agreement of May 1, 1968, after adjusting the amount paid out for allowable costs and expenses, against the principal debtor (see Civ. Code, § 2847) and crediting amounts received on the judgment, is controverted, it must be retried by court or jury, as the case may be, to determine the amount of damages. (See *Newing* v. *Cheatham, supra,* 15 Cal.3d 351, 366; *Gordon* v. *Strawther Enterprises, Inc.* (1969) 273 Cal.App.2d 504, 519 [78 Cal.Rptr. 600]; and *Transport Clearings-Bay Area* v. *Simmonds* (1964) 226 Cal.App.2d 405, 431 [38 Cal.Rptr. 116]; but cf. *Moore* v. *City & County of San Francisco* (1970) 5 Cal.App.3d 728, 734 [85 Cal.Rptr. 281].)

The judgment and the order denying Louisville's motion for judgment notwithstanding the verdict are reversed; the case is remanded with directions to the trial court to render judgment in favor of plaintiff against Surety and Macredes on the issue of liability, and to determine the issue of damages in conformance with the procedure outlined in this opinion.

Molinari, P. J., and Elkington, J., concurred.